**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 15, 2018

**VIA ECF AND HAND DELIVERY**

The Honorable Paul G. Gardephe
United States District Court Judge
Thurgood Marshall Courthouse
40 Foley Square
New York, New York 10007

     **Re:**    ***United States v. Vitaly Borker*, 17 Cr. 391 (PGG)**

Dear Judge Gardephe:

     The Government respectfully submits this letter in connection with the sentencing of defendant Vitaly Borker ("Borker" or the "defendant") and the *Fatico* hearing which took place over the course of two days, on May 23 and 31, 2018 (the "Hearing"). On March 20, 2018, Borker pleaded guilty to conspiracy to commit mail and wire fraud, mail fraud, and wire fraud in connection with Borker's management and ownership of retail website Opticsfast.com ("Opticsfast" or the "Company"). Because the parties disagreed on the calculation of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range, this Court scheduled the aforementioned *Fatico* hearing and directed the parties to submit post-hearing briefing setting forth the sentencing factors in dispute.

     The Government submits that based upon the evidence presented at the Hearing, the Government has proved, by a preponderance of the evidence, that under the Guidelines: (1) the loss associated with the defendant's fraud exceeded $40,000, but was less than $95,000; (2) the defendant was an organizer, leader, manager, or supervisor in any criminal activity; (3) the defendant willfully obstructed, impeded, and attempted to obstruct and impede the administration of justice with respect to the investigation and prosecution of the charged offenses, and the obstructive conduct related to (a) the offenses charged in the Indictment, and (b) a closely related offense; (4) the defendant committed part of the offenses charged in the Indictment while on release in *United States v. Borker*, 10 Cr. 1266 (RJS); and (5) the defendant has not clearly demonstrated acceptance of responsibility through his allocution and subsequent conduct prior to the imposition of sentence.

     Given the seriousness of the defendant's conduct and the need for specific and general deterrence, the Government submits that, for the reasons explained below, a sentence within the Guidelines range of 51 to 63 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## I.   Guidelines Calculation

### a.   Adjustments Not In Dispute

The defendant and the Government agree on the following:

(1) pursuant to U.S.S.G. § 3D1.2(d), Counts One, Two, and Three are grouped together because the offense level is determined largely on the basis of the total amount of loss;

(2) pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7 because the statutory maximum term of imprisonment for the count of conviction is 20 years or more; and

(3) pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), a two-level enhancement applies because the offense involved ten or more victims.

### b.   Disputed Adjustments

The defendant disputes the following:

(1) pursuant to U.S.S.G. § 2B1.1(b)(1)(D), a six-level enhancement applies because the loss exceeded $40,000 but was less than $95,000;

(2) pursuant to U.S.S.G. § 3B1.1(c), a two-level enhancement applies because the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in [subsections] (a) or (b);[1]

(3) pursuant to U.S.S.G. § 3C1.1, a two-level enhancement applies because the defendant willfully obstructed, impeded, and attempted to obstruct and impede the administration of justice with respect to the investigation and prosecution of the charged offenses, and the obstructive conduct related to (a) the offenses charged in the Indictment, and (b) a closely related offense;

(4) pursuant to U.S.S.G. § 3C1.3, a three-level enhancement applies because the defendant committed part of the offenses charged in the Indictment while on release in *United States v. Borker*, 10 Cr. 1266 (RJS);

(5) the defendant is not entitled to any reduction in his offense level pursuant to U.S.S.G. § 3E1.1(a), because he has not clearly demonstrated acceptance of responsibility for his offense

---

[1] The Government's *Pimentel* letter calculated a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b) on the basis that the defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive.  The Government has revised its position and is only seeking a two-level enhancement based on U.S.S.G. § 3B1.1(c).

through his allocution and subsequent conduct prior to the imposition of sentence, including at the *Fatico* hearing;[2] and

(6) due to the defendant's failure to demonstrate acceptance of responsibility as detailed above, the Government will not move at sentencing for any additional reduction to the defendant's offense level pursuant to U.S.S.G. § 3E1.1(b).

In accordance with the Government's Guidelines calculations, the applicable offense level for Counts One, Two, and Three of the Indictment is 22. The defendant does not dispute that he has a criminal history category of III. Accordingly, based upon the foregoing, the Guidelines range is 51 to 63 months' imprisonment. In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At offense level 22, the applicable fine range is $15,000 to $150,000.

## II.    Applicable Law

It is well settled that a district court must find facts relevant to sentencing by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 156-57 (1997); *United States v. Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005) ("[D]istrict courts remain statutorily obliged to calculate Guidelines ranges in the same manner as before *Booker* and to find facts relevant to sentencing by a preponderance of the evidence."); *United States v. Ruggerio*, 100 F.3d 284, 290 (2d Cir. 1996) ("[T]he Second Circuit has held repeatedly that disputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence."). Likewise, the Sentencing Commission has commented that the "use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." U.S.S.G. § 6A1.3, comment.

As the Court is well aware, the Sentencing Guidelines provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, courts must also consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50, 50 n.6.

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this

---

[2] This adjustment to the defendant's offense level is and has always been conditional on the defendant's conduct prior to his sentencing. In light of, among other things, the defendant's testimony at the Hearing, the Government respectfully contends that the defendant is not entitled to any reduction in his offense level for acceptance of responsibility.

defendant, to promote respect for the law, and to protect the public from further crimes by the defendant.  18 U.S.C. § 3553(a)(2)(A)-(C).  These considerations weigh in favor of a sentence within the Guidelines range.

### III.   Evidence Presented

The following witnesses testified at the Hearing:

- United States Postal Inspector Ashley Borofsky;
- Michael Voller, a co-conspirator in the defendant's scheme and a former employee of Opticsfast;
- Renata McGriff, a customer-victim;
- Vitaly Borker, the defendant.

The Government offered the admission of documentary evidence, as described in the Exhibit List attached to this filing as Exhibit A.

### IV.   Discussion

a.   The Intended Loss Amount of the Defendant's Fraud Totaled at Least $40,000

i.   Scope of the Defendant's Fraud

1.   *Repair Fraud Scheme*

The defendant's fraudulent conduct encompassed not only fraudulent charges for shipping labels, but also fraudulent conduct related to Opticsfast's eyeglass repair business.  The defendant has carefully allocated to a shipping label fraud, stating that his fraudulent conduct consisted of coercing customers into paying for shipping labels that they had never used by falsely stating that Opticsfast was charged for those labels.  At his plea allocution, the defendant stated:

> Opticsfast was charged approximately $2.77 and up by Easypost for each [shipping label].  Certain of these customers decided at some point in the future to cancel their [Opticsfast repair] orders and not to use the shipping label.  Michael Voller and I agreed to tell some of these customers that they had to pay Opticsfast $5.49 for the shipping label they received but did not use.  This was my idea.  These were false statements.  This was not true that Opticsfast would lose this money if the customer did not reimburse Opticsfast.  We concealed from the customer that Opticsfast would be reimbursed by Easyport for this expense, and that Opticsfast would not lose money on these labels if they were not used.

(Plea Tr. at 18:19-25-19:14-19).[3]   According to the defendant, this fraudulent scheme only victimized 139 customers.  (Tr. at 272:12).[4]  Assuming each was charged $5.49, the total loss amount is a mere $763 according to the defendant.  (*Id.*).

The documentary evidence and testimony presented at the Hearing flatly contradict the defendant's position that he only engaged in a $700 shipping label fraud.  As the evidence demonstrates, the defendant's fraud scheme in fact victimized hundreds of individuals and resulted in tens of thousands of dollars of loss.  In addition to the shipping label fraud described above, the defendant engaged in a scheme to defraud customers interested in repairing sunglasses and eyeglasses through Opticsfast.  In the course of operating Opticsfast, the defendant and other Opticsfast employees baited customers with guarantees of professional glasses repair using in-house labs and trained specialists and optometrists, with no intention or ability to fulfill those promises.

The defendant and other Opticsfast employees used lies to lure customers into sending in their glasses for a repair quote, told further lies to justify inflated repair charges, then held customers' glasses hostage and used hostile, threatening, or dismissive customer service tactics to discourage customers from seeking refunds.

    2.   *The Defendant Lied to Customers to Induce Them to Send in Their Glasses for Repair Estimates.*

Opticsfast misled customers as to its facilities and capabilities through statements on its website in order to induce customers to send their glasses to Opticsfast.  Opticsfast advertised the following on its website:

- "Our trained lab technicians have decades of experience in the repair of eyeglasses and sunglasses.  Our onsite lab is capable of doing" many types of repairs. (GX-1B; GX-1C).[5]
- "Our specialists are trained to repair all types of eyewear. . . . [O]ur Eyeglass Repair Specialists have devised and created several repair techniques."  (GX-1C).
- "Our specialists are trained to repair all types of eyewear."  (GX-1A; GX-1D).
- "There is a reason why dozens of other repair shops use our facility to repair their own clients [sic] eyewear." (GX-1A; GX-1C).
- "Our second floor has been separated to house two main labs that provide different services.  The Eyewear Repair Lab is staffed by two technicians, five days a week providing internet eyewear repair customers resolutions to the toughest repair jobs.  Our Prescription Lab is staffed by an optometrists [sic] whose task is to produce roughly thirty prescription orders a day for both retail customer and internet customers." (GX-1C).

---

[3] "Plea Tr." refers to the transcript of the defendant's March 20, 2018 plea hearing.

[4] "Tr." refers to the transcript of the Hearing, which took place on May 23 and 31, 2018.

[5] "GX" refers to a Government Exhibit admitted at the Hearing.

- "We are able to offer extremely competitive prices, because all of our repairs are carried out in our own optical lab.  We do not outsource the work to third parties.  We do not send the glasses somewhere else risking the possible loss of your merchandise.  We do this work to the highest quality standards in the industry." (GX-1C).
- "Our competitors do not have two onsite lab's, thus they are not able to offer the same low prices as we do day after day.  In fact the other repair websites you may have visited, probably use our facility to fix their customers frames." (GX-1C).
- "We offer 100% RISK FREE, eyewear repair evaluation."  (GX-1C).
- "[O]ur Eyeglass Repair Specialists have devised and created several repair techniques to fix just about all Titanium frames. We have developed various methods that allow us to repair titanium frames with the utmost durability and the least visibility of the repair area. Many facilities will tell you that this metal is not repairable, or they are not able to repair Titanium. Rest assure you that we can do this work with ease." (GX-1A).
- "We can fit any eyeglasses or sunglasses with your custom prescriptions offering you discounts of up to 50% off standard retail store prices. You can purchase your eyewear from our website, or send in your glasses directly to our lab and we will do the prescription for you." (GX-1B).

The defendant drafted these statements and posted them on Opticsfast's website.  (Tr. at 14:12-15).  These statements were false.  Most evidently, Opticsfast had no in-house technicians, and outsourced nearly all repairs to offsite laboratories that did not work exclusively with Opticsfast.[6]  (Tr. at 57:17-21 (Voller testimony);[7] Tr. at 245:1-3, 246:1-4 (Borker Testimony);[8] GX-2 at 10:50-11:14).  The defendant conceded that Opticsfast "had no in-house trained technicians," (Tr. at 245:17-21), and no in-house eyewear repair laboratory.  (Tr. at 247:22-24).  Yet, while testifying, he gave shifting explanations for why these statements appeared on the website.  The defendant first argued that the statements were justifiable, claiming, "[t]he word 'in-house' was crafted based on the fact that [sub-contractors] were coming to [Opticsfast] on a daily basis and picking up the frames, [then] dropping them off."  (Tr. at 242:25-234:1-2).  He also claimed as accurate the statement that "dozens of other repair shops use [Opticsfast's] facility to repair their own clients' eyewear," even while admitting that Opticsfast was sending customers' glasses offsite for repair by a third party.  (Tr. at 244:18-25, 245:1-4).  Yet the defendant later asserted that the Opticsfast website pages at issue, which included the "Frequently Asked Questions" portion of the website, were "fluff pages," (Tr. at 254:20-21), and they were "not somewhere that a customer would . . . see" because "it's not a page that people target," (Tr. at 249:9-12).  Yet the defendant ultimately admitted that these "fluff" pages "were designed . . . to

---

[6] There is no dispute that Opticsfast did not directly employ trained technicians.  (*See, e.g.*, Tr. 51:21-23; 60:4-10).

[7] ("Q. Did OpticsFast have an on-site lab? A. We did not. Q. Did OpticsFast have trained lab technicians that it employed? A. No.").

[8] ("THE COURT: But you actually weren't fixing the glasses; you were sending the glasses out to someone else? [BORKER]: To subcontractors, yes.") (Q. Off-site subcontractor even? A. Who came to pick up the glasses from us on a daily basis. Q. OK. So they picked up and repaired off-site? A. In Queens.").

make the customer feel like [Opticsfast] is a much bigger operation than it was," (Tr. at 254:24-25), and agreed that he posted untrue statements on the website to give customers "greater confidence in [Opticsfast's] ability to repair" glasses, (Tr. at 248:6-9). By posting these statements, the defendant continuously and deliberately solicited customers based upon these false assurances, which Opticsfast was incapable of fulfilling.

The aforementioned lies, on their face, were material misstatements. The lies went to the heart of the quality and type of repair services customers could expect from the Company. The customer complaints—which cite to statements on Opticsfast's website—demonstrate that customers relied on the statements posted to the website, contrary to the defendant's assumption. (*See, e.g.*, GX-300F ("This company claims to be able to repair pretty much any damaged sunglasses"); GX-300M ("Optics Fast advertises on a web cite [sic] that it will repair Revo sunglasses"); GX-300E ("It is my understanding that you will provide an estimate within 3 to 5 business days upon receipt of my glasses. It is now 8 business days since you received my eyewear and I still have not received my estimate. This is not an accurate description of your advertisement and is eroding my confidence in doing business with you."); GX-300G (I requested that they return glasses to me since they falsely advertised. [Opticsfast] refused until I pay shipping expenses eventhough they advertised free shipping."); GX-120 ("I . . . was drawn to the website by the promise of being able to ship the glasses for free, and have them repaired, and then shipped back."); GX-126 ("The company's website advertised that Opticsfast could do welding and mending, which I needed.")).

Opticsfast employees continued to lie when customers called with questions. (*See, e.g.*, Tr. at 121:14-18, 122:3-4 (McGriff testimony)). The defendant instructed Opticsfast employees on what information to provide—or withhold—from customers. (*See* GX-149D ("Everything should be a YES and we deal with problems later"); GX-149E ("Let's not tell customers that RX takes 2 weeks")). The defendant, in conjunction with Michael Voller, instituted a practice of deliberately lying to customers who asked about estimates for repairs before sending their glasses to Opticsfast to be fixed. Specifically, as Michael Voller testified, if a customer contacted Opticsfast seeking an initial repair estimate, Opticsfast would deliberately "lowball" the cost of repairs. (Tr. at 41:25-42:1-2). Although there were pre-set prices for certain types of repairs, Opticsfast employees would deliberately lie about the true cost of these services. (Tr. at 41:25-42:1-9; 43:17-25-44:1-20). Employees "would tell [a customer] it's $10 to repair something. Once they send [their glasses] in, then we can always inflate to 20, 25, 30, whatever it is." (Tr. at 42:3-6). The defendant and Voller lied to customers so that they would believe Opticsfast was a "great" and "cheap service" as compared to competitors. (Tr. at 42:2-3). Customers would "feel more comfortable sending the frame" to Opticsfast if the Company "set a lower price" initially. (Tr. at 107:5-7). As explained below, these lies were designed to convince customers to send in their glasses to Opticsfast for a repair estimate so that Opticsfast would have leverage over the customer.[9] *See infra* Part IV.a.i.5.

---

[9] This conclusion is consistent with Judge Sullivan's findings when ruling on the defendant's violation of the terms of his supervised release. Judge Sullivan found that the defendant "did whatever it took to entice customers into either sending their eyewear, placing an order, or requesting an appraisal so that Opticsfast could impose charges," including "misrepresent[ing] what kinds of repairs it could perform, what kind of

3.   *Opticsfast Lied to Customers After They Sent In Their Glasses for Repair Estimates*

The defendant and other employees lied to customers because they knew that "[o]nce you have [a customer's] frame in possession, you can always increase the price on the back end."  (Tr. at 107:7-8).  Opticsfast employees did precisely that, by continuing to lie to customers about their repair services once they had possession of customers' glasses.  Once Opticsfast received glasses from a customer seeking a repair estimate, Opticsfast employees generated an invoice.  (Tr. at 39:12-25-40:1-18; GX-300D).  This invoice contained the true, pre-set cost for the repair the customer had requested, which was in many cases higher than what was originally quoted in response to a customer inquiry.  (Tr. at 41:8-22).  But the invoice also contained line items for additional repairs that the customer had not requested, even though those repairs were often unnecessary.  (Tr. at 47:2-13, 24-25; Tr. at 48:1-24).  This practice of including unnecessary repairs on invoices occurred "daily" because the defendant and Voller "knew that we were going to make more profit out of it."  (Tr. at 48:6-9, 23).  If a customer inquired about the invoice, Opticsfast employees would not reinspect the glasses to justify the repair.  (Tr. at 50:24-25-51:1).[10]  Instead, employees would provide "a generic, canned response just based on the inquiry."  (Tr. at 51:4-5).  Employees would falsely represent that these additional repairs were necessary if asked by a customer.  (Tr. at 51:14-15).

Unsurprisingly, this practice is reflected in the descriptions provided in customer complaints.  (*See, e.g.*, GX-300A ("I was told via their customer service that the[] repair[] normally cost between $15 and $30.  I shipped my glasses to them" and "[a]fter 2 weeks I received an estimate for $99.98"); GX-300G ("I was told over the phone and via email that replacement of both temples along with the parts . . . will be $40 - $45. . . . When they received my glasses they told me it will cost over $300"); GX-300H ("When I first contacted [Opticsfast] on price they told me around 58.00. So I sent them" my glasses and "[t]hen [t]hey told me the repairs would be 99.00"); GX-300I ("By e-mail previously they quoted a price of $70. The final bill was $95"); GX-300J ("I received an email estimated quote of $35. . . . Upon receiving the eyeglasses they would not stand by there [sic] estimate, but increased it to $70. . . . [W]hy would they quote this price if they knew they could not do it for this price?"); GX-300R ("I was quoted a price to fix a pair of sunglasses. Now the seller is claiming I owe $59.00 more dollars plus $12.00 more dollars in shipping")).[11]

---

facilities it possessed, what repairs would cost, and how long they would take in order to induce customers to hand over their glasses."  *United States v. Borker*, 10 Cr. 1266 (RJS) (Dkt. Entry 168 at 3).

[10] ("Q. Before you responded to an inquiry, would you go back and reinspect the glasses? A. No.").

[11] In the defendant's violation of supervised release hearing, Judge Sullivan ruled that the affirmative misrepresentations the defendant made "regarding Opticsfast's capabilities, facilities, turnaround time, and intentions" "when considered in tandem with victim affidavits . . . reveal a scheme designed to induce customers into making inquiries online in order to ensnare them in a web from which they could not emerge without paying money, even when they received nothing of value from Opticsfast."  *United States v. Borker*, 10 Cr. 1266 (RJS) (Dkt. Entry 168 at 2).  Specifically, Judge Sullivan found that Opticsfast's aim was to have "customers . . . provide their eyewear – and their credit card numbers – which" the defendant "would then employ as leverage to extract more money while holding their glasses hostage."  *Id.*

These lies were particularly insidious because customers who had visited the Opticsfast website were led to believe that their glasses were being inspected by in-house optometrists and lab technicians who had thereafter generated a repair invoice. Customers were not aware that their glasses had been inspected by laymen like the defendant and Voller, who were only interested in making a profit. As Voller testified at the Hearing, "it was our role to make sure that we can . . . convince that customer if they thought maybe we were the experts . . . that [repair] A would be necessary or [repair] B would be necessary." (Tr. at 49:16-20). The defendant denied any knowledge of this practice and pointed to other Opticsfast employees, "Yelena"[12] and "Marina" who "did all the invoicing." (Tr. at 215:2-15). Even if true, the defendant was the one who gave directions to Opticsfast employees and who trained "Yelena." (Tr. at 30:2-3; GX-149B; GX-149D; GX-149E; GX-149K). And it is undisputed that the defendant personally handled communications with customers. (*See, e.g.*, DX-C at 40, 42).[13]

### 4. *Opticsfast Defrauded Customers By Failing to Repair Glasses*

Ultimately, when customers did pay for eyewear repair—under the mistaken belief that trained, in-house Opticsfast technicians and/or optometrists would be repairing their glasses—customers often received their glasses back damaged or altered in such a fashion that the glasses were further damaged or unwearable. (*See, e.g.*, GX-114 (customer paid for, but never received, replacement lenses from Opticsfast); GX-115 (customer was informed that glasses repair was complete, but Opticsfast returned the glasses in the same damaged condition); GX-116 (rather than repair customer's glasses, Opticsfast returned them with lenses in a different color than the originals); GX-120 (customer paid for repair but received the glasses from Opticsfast with scratched lenses); GX-121 (Opticsfast replaced arms on customer's glasses with arms of a different sunglass model); GX-123 (Opticsfast ruined glasses by drilling new holes into the frame and attaching the arms of the glasses with glue); GX-124 (Opticsfast failed to repair glasses and returned them with the arms significantly bent); GX-125 (Opticsfast returned glasses sent in for repair in the same broken condition as when they were sent in); GX-126 (Opticsfast "repaired" glasses using the wrong parts); GX-147 (same); *see generally* GX-201; GX-201A)). Many failed repair orders were never corrected by the Company. Instead, as explained below, Opticsfast employees actively dissuaded customers from pursuing their complaints.

### 5. *The Defendant Intended to Defraud Customers*

The defendant's intent to defraud customers is clear when reviewing customer complaints. The defendant and other Opticsfast employees used threats, harassment, or hostility to coerce customers into paying for repair services, or to discourage customers from pursuing refunds.

*First*, when customers disputed their repair bill, or decided to forego Opticsfast's repair services, Opticsfast employees used customers' glasses as leverage to coerce the customer into

---

[12] "Yelena" is also identified as "Lena" in the transcript. Based on the reference to her pseudonym at Opticsfast, "Kristen," the Government understands that "Yelena" and "Lena" are the same individual.

[13] "DX" refers to a Defense Exhibit admitted at the Hearing.

paying for the repair.  Opticsfast would hold customers' glasses hostage, refusing to return them. (*See, e.g.*, GX-300R (customer reported that after he declined a hinge repair, Opticsfast "email[ed] [him] twice a day asking for repair money" "they are holding [his] frames until [he] pay[s]"); GX-300C ("Threatened to continue to increase cost [of repair] if writer didn't pay. Refused to send item back when [customer] disagree with estimate."); GX-300L ("I replied [to Opticsfast] that per their website, I would pay to reimburse them for shipping to send the[] [glasses] back to me and I didn't want to use their service. After repeated attempts and over 30 emails they have not given me the information on how to get my glasses back. Becky S has threatened me with collections, tried to extort me for exorbitant shipping costs to get my glasses back, and has outright refused to give me straightforward answers on when I can get my glasses shipped back to me.")).

Opticsfast also had a practice of threatening to throw customers' glasses away if they did not agree to have a repair.  (*See, e.g.*, GX-149B (Email from the defendant: "Are you sending the threat to throw away glasses email?"); GX-149K (Email from the defendant: "This is very important to send when you send bills by mail Did you want me to dispose of your merchandise or did you want to pay the repair invoice?")).[14]  These threats were not delivered as a last resort for customers that had abandoned their glasses.  They were conveyed to customers while in the middle of communications regarding their dispute.  By way of example, when one customer declined a repair, an Opticsfast employee demanded that the customer pay "a $25 fee for the time you wasted." (GX-300E).  The customer refused to make the payment and asked that his glasses be returned within five business days, yet received no response.  Ten days later, the customer lodged a complaint with the Better Business Bureau. (GX-201).  While the dispute was still pending, "Becky S." from the Opticsfast sales team wrote to the customer: "Are you going to pay for the return shipping or should we discard your item?" (GX-300E).  Another customer complained that a repair estimate they received was "too high" and the customer "kept asking" Opticsfast to return the glasses.  (GX-300U).  After the customer's fifth request for the return of his glasses, "Becky" from the Company then responded, "Did you want me to dispose of your merchandise or did you want to pay the repair invoice?"  The customer "consider[ed] this to be a threat to throw away [the customer's] property unless [he paid] an invoice."  (GX-300U).[15]

*Second*, when customers sought refunds or other recourse, they were summarily denied any remedy, and then insulted, harassed, and intimidated by employees so they would abandon their complaints.  (*See, e.g.*, GX-114 (customer received no "individualized response" when requesting refund); GX-115 (no refund provided for botched repair; "the Opticsfast customer service representative replied: 'I am very not worried.  I have been doing this for a decade.  I will teach you a thing or 2 indeed.'"); GX-117, Exhibit A at p. 18 (customer received 35 repeated phone calls from Opticsfast and a call from a man posing as a police officer reporting a civil suit against the customer; customer accused of being "a total degenerate … I[t] could have been done another

---

[14] When ruling on the defendant's violation of the terms of his supervised release, Judge Sullivan found that these statements were indeed threats, and they "were the rule, not the exception, at Opticsfast." *United States v. Borker*, 10 Cr. 1266 (RJS) (Dkt. Entry 168 at 3).

[15] Even when a customer was successful in convincing Opticsfast to return their glasses, they had to pay inflated return shipping costs.  These were sometimes as high as $12 or $14.95, (GX-300R; GX-300F; GX-300H), despite the defendant's statement at his plea allocution that Opticsfast paid approximately $2.77 for Easypost shipping labels and charged customers $5.49 for those labels.  (Plea Tr. at 18:19, 18:23).

way but you choose this route.. Now sit in what you made"); GX-118 (Opticsfast contacted customer multiple times a day, every day via calls, texts, and emails demanding payment for unused shipping label after customer was waiting for news on his cancer diagnosis); GX-119 (when customer refused to choose a pair of glasses different from those he ordered, customer service representative said, "I have your money buddy."); GX-122 (Opticsfast sent "harassing emails and texts" demanding payment for unused shipping label and threatened to send customer to collections); GX-123 (customer service ignored customer seeking refund); GX-153 (customer service "harassed" customer seeking to cancel an order, calling her "rude and inappropriate names"); GX-155 (Opticsfast refused repeated requests for a refund for an unfulfilled order)). The customer affidavits report similar interactions with the same theme: in response to customer complaints, Opticsfast employees harassed, ignored, insulted, or threatened customers.

Renata McGriff, a customer-victim who testified at the Hearing, was derided when she called Opticsfast's customer service team to inquire about the tardiness of her eyeglass repair order. (Tr. at 130:14-22, 132:7-8, 137:12-16). While on the phone with a male employee, Ms. McGriff testified that he threatened her by stating, "I know where you live." (Tr. at 128:15-16). After weeks of delays, and abhorrent treatment by Opticsfast staff, after Ms. McGriff received her damaged eyeglasses her only recourse was to dispute the charge with her credit card company. Ultimately, Ms. McGriff only received a partial refund of her funds from American Express because Opticsfast challenged her charge-back, even though it had obtained her business by deceiving her and had destroyed rather than repaired her glasses and lenses. (Tr. at 136:22-25-137:1-7). Such "failure to respond to requests for refunds by victims is . . . probative of fraudulent intent." *United States v. Walsh*, 6 F. App'x 781, 786 (10th Cir. 2001) (citing *United States v. Masten,* 170 F.3d 790, 795 (7th Cir. 1999)).

*Third*, the defendant's prior involvement in a similar eyewear repair fraud scheme through his website Decormyeyes proves his intent while operating Opticsfast. *See, e.g.*, *United States v. Cadet*, 664 F.3d 27, 32-33 (2d Cir. 2011) ("Evidence of other acts need not be identical to the charged conduct to show . . . intent . . . so long as the evidence is relevant in that it provides a reasonable basis for inferring . . . intent."); *United States v. Brown*, 147 F.3d 477, 483 (6th Cir. 1998) (finding evidence that defendant defrauded customers through one telemarketing company probative to show he acted with intent to defraud at another where defendant claimed he was a legitimate salesman); *United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir. 1988) ("the prior acts need not duplicate exactly the instant charge, but need only be sufficiently analogous to support an inference of criminal intent."). As the defendant himself stated once he resumed work at Opticsfast following his release from prison: "I am so happy to be back!!!!! [T]his is what I miss[,] not orders not anything but just FUCKING AROUND with people." (GX-103I).

The defendant's Opticsfast business—which he launched and operated before he was convicted for his Decormyeyes-related fraud—was just another iteration of the defendant's fraudulent scheme. (*See* GX-112 ("Worst case I take a little break rebuild a site with new name under someone elses [sic] name and back in business"). On May 12, 2011, before Judge Sullivan, the defendant pleaded guilty to: mail fraud, in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18 U.S.C. § 1343; and two counts of making threats in interstate communication, in violation of 18 U.S.C. § 875(c), in connection with Decormyeyes. Asked by the Court whether, when he "did these things with respect to the repairs," the defendant knew that what he was "doing

was wrong and illegal," the defendant responded: "Yes, I did." (GX-4 at 40:8-9). The defendant now claims that his intent with Opticsfast "was to clean up and to make everything better." (Tr. at 265:18). Yet there is little evidence—other than the defendant's own self-serving statements—that indicate that he meaningfully changed his behavior when operating Opticsfast. In private, the defendant revealed that he was content with having "10% unhappy" customers, dismissing customer complaints as a necessary cost of the "dirty business" of eyewear repairs. (GX-103U at 24-25). Indeed, having pled guilty to mail and wire fraud, as well as to making interstate threats, the defendant knew better than to boast that absent death threats to customers, his fraudulent practices would no longer be criminally actionable. (*See* GX-103I ("NO MORE DEATH THREATS threats = jail no threats no jail")). But as is clear from the record, the defendant could not abide by his own advice, and continued to threaten and harass customers while operating Opticsfast. The similarities between Decormyeyes and Opticsfast establish that the defendant's actions were no accident, but the intentional perpetuation of a fraud on consumers.

As the defendant admitted, his intent with Opticsfast was to continue his Decormyeyes business: "[t]he staff would remain the same, the vendors would remain the same, and the systems would remain the same." (DX-C at 4). Both businesses were online merchants offering eyeglass repair services. The defendant used the same Decormyeyes website model and customer databases when he launched Opticsfast. (Tr. at 289:24-25-290:1-5 (Borker testimony);[16] Tr. at 22:5-7 (Voller testimony)). And the defendant's fraudulent business practices were similarly carried over to Opticsfast.

As with Opticsfast, while running Decormyeyes, the defendant had a practice of using customer property as leverage when a customer refused to pay for unsolicited repair services. The defendant stated at his Decormyeyes plea hearing before Judge Sullivan: "I told some of these customers that they would not get their glasses back until the bill was paid." (GX-4 at 38:11-13). Further, as with Opticsfast, the defendant fraudulently charged Decormyeyes customers shipping fees: while at Decormyeyes, the defendant introduced a "New Scam" wherein he would charge customers for shipping, hoping they would miss the extra charge. (GX-102). As the defendant wrote, "This whole repair business is a game of fucking chess.. I make my move and see what they respond with. PS: Please don't testify against me in court eventually." (*Id.*). Moreover, as with Opticsfast, the defendant and his employees threatened, harassed, and badgered customers to intimidate them. (*See* GX-4 at 33:19-25-35:1-17 (Borker admitted to writing emails to Decormyeyes customers "saying that I know where they live"); Tr. at 128:15-16 (Renata McGriff testimony stating a male Opticsfast employee told her, "I know where you live.")).

*Fourth*, the defendant has suggested that Opticsfast did not refund customers for botched repairs because it was against Opticsfast policy to do so, as disclosed on its website. (DX-2G (website screenshot from April 10, 2015)). To the Government's knowledge, this is the earliest iteration of the website in the record that stated Opticsfast would not provide a refund for repair orders—dated almost four years after the website was launched in the spring of 2011. Moreover,

---

[16] ("Q. What was the relationship between the DecorMyEyes website in terms of details and notices, etc., and the language on the OpticsFast website? A. It was essentially identical. It was a copy and paste from DecorMyEyes to OpticsFast with a couple of enhancements, with a couple of changes. It was basically the continuation of DecorMyEyes but to do everything clean, the right way.")

the disclosure policy was listed at the bottom of the "frequently asked questions page."[17]  This was a comparatively obscure location on the website as compared to the statements offering a "100% risk free eyewear evaluation," which were posted next to the online form where customers could initiate the process of submitting their eyeglasses for a repair estimate.  (GX-1C).  Notwithstanding the limited probity of this disclaimer, even the defendant contradicted this argument by testifying that: the "website policy" was that "sunglass repairs are eligible for refunds," (Tr. at 199:17-21); "[i]f the glasses can't be fixed, they would come back to us, and then Michael [Voller] would issue a refund . . . .  We absolutely would give [customers] their money back if the customer asked for their money back if the glasses could not be repaired and then we would return the glasses back to them," (Tr. at 280:24-25-281:1-5); and "If there was work that we did not do and the customer wanted a refund, we gave refunds," (Tr. at 258:2-3).

The "no refund" disclaimer posted at the bottom of the website's "Frequently Asked Questions" page does not sanitize the defendant's fraud.  *United States v. Warshak* is illustrative on this point.  631 F.3d 266 (6th Cir. 2010).  In *Warshak*, the defendant operated a business that purported to sell a male enhancement supplement using deceptive print and radio advertisements that included false information.  *Id.* at 276-77.  For customers who requested a free sample, the company had a practice of automatically sending additional shipments to the customer for a fee, until the customer chose to opt out of the "auto-ship" program.  *Id.*  At certain points during the course of the fraudulent scheme, a disclosure was posted to the company's website stating the company's auto-ship policy for customers requesting a free sample.  *Id.*  On appeal, the Sixth Circuit found unconvincing defendant's argument that he had not committed a fraud because "in some cases, the customers involved were aware that they had been enrolled in the auto-ship program" through the company's disclosures, and that "a number of customers were able to obtain full or partial refunds."  *Id.* at 311.  The Court noted that the defendant had "misse[d] the point" because the defendant's "method of doing business was deliberately geared toward deceiving customers" when looking at the entirety of the company's sales operation.  *Id.*  As with *Warshak*, the defendant's repair fraud operations employed multiple levels of deceit to convince customers to send in their eyeglasses, pay for repair services, and abandon claims for refunds.  A general "no refund" disclaimer posted on the Opticsfast website years after Opticsfast launched does not negate the defendant's intent to defraud.[18]

*Finally*, it is of no consequence that some customers received the repair services they bargained for.  "Evidence of past 'good acts' by a defendant is generally not probative unless a defendant is alleged to have 'always' or 'continuously' committed 'bad acts,'"  *United States v. Damti*, 109 F. App'x 454, 456 (2d Cir. 2004), which the Government has not alleged here.  Where the Government has not argued "that 'all' of the defendant's customers were defrauded," evidence of good acts are not probative.  *Id.*  Similarly here, the Government has not contested the fact that

---

[17] To the extent the defendant's testimony was that he did not believe customers read the "Frequently Asked Questions" pages of the website he designed because they were "fluff," (Tr. at 248:6-9, 249:9-12, 254:20-25), his decision to place the refund disclaimer on one of these pages is telling.

[18] In the civil context, general disclaimers on website are not a defense to deceptive trade practices.  *See, e.g.*, *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 323-27 (2d Cir. 2002) (finding "as is" disclaimer on website did not establish defense as a matter of law to deceptive trade practices claim because service provided was defective, defendant knew it was defective, and service was in defendant's control).

some customers received repaired glasses and were satisfied with their repairs. Consequently, any evidence of so-called satisfied customers does not undercut the Government's proof of the defendant's scheme to defraud.

> ii.   Loss Amount from the Repair Fraud and Shipping Label Fraud

> 1.   *Applicable Law*

Pursuant to U.S.S.G. § 2B1.1(b)(1)(D), a six-level enhancement applies because the loss of the defendant's fraudulent scheme exceeded $40,000 but was less than $95,000. "[L]oss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1), cmt. n. 3(A). "The court need only make a reasonable estimate of the loss. . . . [considering] [t]he approximate number of victims multiplied by the average loss to each victim." *See* U.S.S.G. § 2B1.1(b)(1), cmt. n. 3(C); *accord United States v. Abiodun*, 536 F.3d 162, 167 (2d Cir. 2008). The sentencing court is not required to "calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997) (per curiam). "[I]t is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *Id.* at 76; *see also United States v. Kumar*, 617 F.3d 612, 632 (2d Cir. 2010) (citing with approval *United States v. Rostoff*, 53 F.3d 398, 407 (1st Cir. 1995) ("Calculating the amount of loss for purposes of the sentencing guidelines is more an art than a science. Courts can, and frequently do, deal with rough estimates.")). The loss amount includes, "in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).[19]

> 2.   *The Loss Amount Set Forth In GX-201 Is Reliable and Conservative*

The entirety of the defendant's fraudulent scheme does not amount to a $763 fraud. The evidence in the record establishes that the intended loss attributable to the defendant's fraudulent scheme is at least $40,000.

As reflected in Government Exhibit 201, the Government asks the Court to find that the loss amount attributable to the defendant's fraudulent scheme is approximately $41,802.49. This is both a reliable and conservative estimate of the intended loss associated with the defendant's scheme. Government Exhibit 201 is based upon hundreds of customer complaints submitted to

---

[19] In an illustrative case, the Ninth Circuit held that a defendant who prepared deceptive marketing material for a company and had "a pretty deep awareness of the problems and the fraud that was being perpetrated" was responsible for the entire loss amount caused by the actions of others at the business. *See United States v. DiRoberto*, 686 F. App'x 458, 464 (9th Cir. 2017). The defendant does not dispute that he listed false statements on the website, and his oversight of customer service and instruction to other employees is sufficient to find him responsible for the entire loss amount associated with Opticsfast's fraudulent practices.

the Better Business Bureau ("BBB"), the Federal Bureau of Investigation's ("FBI's") Internet Crime Complaint Center ("IC3"), and the Postal Inspection Service ("PIS"). Postal Inspector Borofsky testified that she reviewed these complaints and identified those that pertained to repair service fraud or shipping label fraud. (Tr. at 144:10-18). The loss amount is based upon each complainant's self-reported loss. (Tr. at 147:20-24). For the 37 customers complaining of repair fraud that did not self-report the dollar amount of loss that they suffered, Agent Borofsky calculated the average loss for complainants in the same category, multiplied that figure by the 37 customers previously identified, and added it to the self-reported loss amount. (Tr. at 148:20-25-149:1-8). This resulted in a total loss amount of $41,802.49. (GX-201).

This methodology is reliable. Customers with a grievance about a business typically seek a remedy with the business itself before reaching out for third party intervention with the likes of the BBB, FBI, or PIS. Consequently, these complaints reliably measure customers who could not resolve their issues with Opticsfast directly. Other courts have relied on similar customer complaints to tally loss amounts for purposes of Guidelines calculations. *See, e.g.*, *United States v. Socolovitch*, 340 F. App'x 291, 297 (6th Cir. 2009) (Better Business Bureau complaint formed basis for part of loss calculation); *United States v. Levy*, 335 F. App'x. 324, *326, 329 (4th Cir. 2009) (per curiam) (affirming loss amount calculation based upon IC3 victim complaints compiled by testifying agent). Such approximations and extrapolations from record evidence are common.

The Government's requested loss calculation approach is also conservative. GX-201 only includes those customers that complained to the BBB or the FBI. It does not encompass customers who abandoned their complaints or who disputed their charge only with their credit card companies or Paypal. Evidence of the loss amount for the shipping label fraud indicates that the loss amount in GX-201 is only a small subset of those customers that actually suffered a loss. The defendant has indicated that Opticsfast's shipping label fraud loss amounts to $763. (Tr. at 272:12). According to GX-201, the loss attributable to Opticsfast's shipping label fraud that led customers to submit complaints to the BBB, FBI, or PIS amounts to $404.51. Assuming the accuracy of the $763 loss amount, this means that the actual shipping label fraud loss is 189% of the loss amount reported in customer complaints, as shown in GX-201. These shipping label fraud loss numbers may be analogized to the repair fraud scheme. 189% of the $41,802.49 loss stemming from customer complaints of glasses repairs (as reflected in GX-201) amounts to $79,006.71. Although this dollar amount is a closer approximation of the loss from Opticsfast's repair fraud scheme, this analogy itself understates the loss. Because the defendant is held accountable for all the loss he intended to cause, and not merely the loss that was actually caused, even $79,006.71 may fall short of the loss applicable for purposes of the defendant's Guidelines calculation. In short, there is every indication that GX-201 is a conservative estimate of the defendant's intended loss.

### 3. *Any Refunds Should Not Be Credited Against the Loss Amount*

Any refunds provided to customers after they lodged complaints with third parties should not be credited against the loss amount for several reasons.

First, the Court must measure the loss the defendant intended to cause if it is greater than the loss actually incurred. U.S.S.G. § 2B1.1(b)(1), cmt. n. 3(A) ("loss is the greater of actual loss

or intended loss"). "A defendant 'is presumed to intend the natural and 'probable' consequences of [his or her] acts.'" *United States v. Coriaty*, 300 F.3d 244, 251 (2d Cir. 2002) (quoting *United States v. Jacobs,* 117 F.3d 82, 95 (2d Cir. 1997)). The Company's intent is clear from its treatment of customers who sought refunds or recourse. Opticsfast employees failed to provide refunds when they were due and instead threatened, harassed, or dismissed customers to dissuade them from pursuing their claims. *See infra* Part IV.a.i.5. The "natural and probable" consequence of such behavior is that customers would abandon their claims and suffer a loss.

Moreover, no reduction to the loss amount is merited where a customer had to involve a third party (such as the BBB, IC3, or credit card companies) before receiving a refund.[20] Courts have found that that any repayments or refunds made to prevent discovery of fraud or to provide "a veneer of legitimacy" should not be credited against the calculation of a loss amount. *See Coriaty*, 300 F.3d at 251 (citing *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997)) ("[L]oss in fraud cases includes the amount of property taken, even if all or part has been returned."); *United States v. Koh*, 199 F.3d 632, 642 (2d Cir. 1999) (finding loss amount includes money repaid to victims that was "necessary for the scheme to continue"); *United States v. Mucciante*, 21 F.3d 1228, 1238 (2d Cir. 1994) ("loss does not always equal the actual financial harm suffered by the victim" (citation omitted)); *United States v. Barbera*, No. 02-CR-1268, 2005 U.S. Dist. LEXIS 24454 at *14 (S.D.N.Y. Oct. 20, 2005) ("Where . . . the payment of certain funds is necessary in order for the scheme to continue, the amount paid to sustain the scheme may not be used to offset the gross loss amount." (citation omitted)); *see also United States v. Callaway*, 762 F.3d 754, 759 (8th Cir. 2014) ($36,000 repayment against $300,000 taken from victim in mail and wire fraud scheme did not offset loss amount).

Finally, as demonstrated by Ms. McGriff's testimony and by the customer affidavits, in many cases refunds were only provided because customers also disputed the Opticsfast charge with their banks or credit card companies. (*See, e.g.*, Tr. at 136:22-25-137:1-7 (McGriff testifying that she received only a partial refund of the Opticsfast payment from her credit card company because Opticsfast disputed the charge-back); GX-115; GX-121; GX-155)). Accordingly, any internal Opticsfast records or self-serving statements by the defendant indicating that a refund was issued to a given customer are inherently unreliable, as any refund may only have been granted because it was compelled by a third party. Certainly, under such circumstances, the refunded amount should not inure to the defendant's benefit. *Cf. United States v. Levy*, 335 F. App'x 324, *326, 329 (4th Cir. 2009) (per curiam) (credit card charge-backs used to prove mail and wire fraud of online retailer who did not fulfill customers' orders).

---

[20] Even if no report had been made to a third party, repayments provided after a victim uncovers a fraud do not reduce the loss amount. Under U.S.S.G. § 2B1.1, cmt. n. 3(E)(i), the loss amount is only reduced for refunds made before the offense was detected, which "is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *See United States v. Rosen*, 409 F.3d 535, 550-51 (2d Cir. 2005) ("The loss estimate may include amounts that have been repaid to victims after discovery of the crime."); *United States v. Matt*, 116 F.3d 971, 972-75 (2d Cir. 1997) (finding defendant's repayments to victim after discovery of the scheme by victim do not reduce the loss amount).

The defendant's failure to provide victims with refunds when they were initially requested—and only providing a remedy after a third party was notified—evidences the defendant's intent to inflict a loss. Consequently, any refunds to customers provided after these complaints were filed with the BBB, FBI, or PIS should not benefit the defendant by offsetting the applicable loss amount.

> b. The defendant committed part of the offenses while on release

Pursuant to U.S.S.G. § 3C1.3, a three-level enhancement applies because the defendant committed part of the offenses charged in the Indictment while released in connection with another federal offense. U.S.S.G. § 3C1.3 cmt. n. 1. As established in the preceding section, the defendant's fraudulent scheme encompassed Opticsfast's repair business, not only fraudulent charges for shipping labels. The defendant perpetuated the fraudulent Opticsfast scheme in 2011 and 2012, before the defendant was remanded and while the defendant was on release in *United States v. Borker*, 10 Cr. 1266 (RJS), in connection with Decormyeyes.

The defendant was arrested for his participation in Decormyeyes on December 6, 2010. (GX-200). Three days before the defendant was arrested, he convinced his friend Eugene Radomylsky to incorporate Opticsfast in his name. (GX 200; Tr. at 222:20-25-223:1-3). The defendant was detained until the Court granted his motion for reconsideration of the Court's detention order on or around April 6, 2011, shortly after which the defendant was released. (GX-200). Soon after his release in April 2011, the defendant launched Opticsfast, transferred the Decormyeyes employees, systems, and vendors to Opticsfast, and operated the company while he was at liberty. (DX-C at 5-6). The defendant ran his Opticsfast business until he was remanded on or about July 11, 2012. (GX-200). In anticipation of his imprisonment, the defendant trained Michael Voller and intended to have him and others "manage and run Opticsfast going forward until [his] return." (DX-C at 6; *accord* Tr. at 226:14-17).

There was little different in Opticsfast's eyewear repair operations from 2011 through to the date of the defendant's arrest. When the defendant launched Opticsfast while he was bailed in 2011, he drafted and posted fraudulent misrepresentations on the Opticsfast website. (*See* GX-1A ("Our specialists are trained to repair all types of eyewear"; "our Eyeglass Repair Specialists have devised and created several repair techniques to fix just about all Titanium frames . . . . There is a reason why dozens of other repair shops use our facility to repair their own clients [sic] eyewear")). Further, victim complaints dating to transactions between the website's launch and July 2012 indicate that Opticsfast was defrauding eyewear repair customers at this time. (*See, e.g.*, GX-300M (Opticsfast sent wrong pair of glasses to customer; customer service hung up on customer seven times, was "discourteous and unkind" and refused to resolve issue without payment for return shipping); GX-300O (Opticsfast returned glasses customer had submitted after Company claimed it could not repair them, but refused to issue a refund); GX-300P (Opticsfast delayed repair for weeks providing the same excuse that glasses were lost; "manager" refused to read customer's complaint email because it was too long; Opticsfast stopped responding to customer); GX-300N (Opticsfast sales team emailed complaining customer, writing, "[Y]ou can read all of your emails yourself to remind your stupid self why this happened. Don't contact me anymore unless you want to apologize, pay for progressive [lenses], send me a check for the cost to do the work. Otherwise go away.")). These factors indicate that Opticsfast's repair fraud scheme consistently defrauded

customers between the website's launch through the date of the defendant's arrest. Consequently, it is apparent that the defendant engaged in criminal conduct related to Opticsfast while on release in connection with *United States v. Borker*, 10 Cr. 1266 (RJS).

  c. <u>The Defendant was an Organizer, Leader, Manager, or Supervisor of Criminal Activity at Opticsfast</u>

    Pursuant to U.S.S.G. § 3B1.1(c), a two-level enhancement applies because the defendant was an organizer, leader, manager, or supervisor at Opticsfast. This adjustment is appropriately applied where the defendant has "management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1(c), cmt. n. 2. By the defendant's own admission, he: founded Opticsfast, (Tr. at 220:8-14; DX-C at 5); managed Opticsfast while he was bailed in connection with Decormyeyes, (Tr. at 172:1-8; DX-C at 5-6); resumed management of Opticsfast after he was released from prison, (Tr. at 234:11-18; DX-C at 8, 9); was responsible for "get[ting] the business and site running properly," and growing the repair business operation, (DX-C at 9); was a "partner" in the business with Michael Voller and "sometimes told him what to do," (DX-C at 21); controlled what was drafted and posted to the Opticsfast website, (DX-C at 19-21, 28; Tr. at 244:3); and received 60% of Opticsfast's profit after his release from prison, (Tr. at 29:5-8; DX-C at 18). To friends, he described himself as "programmer/salesperson/architect . . . all in 1" for Opticsfast. (GX-103B). He also told friends that he worked in Opticsfast customer service. (GX-103M ("email sales@opticsfast.com, I will respond from work"); GX-103T ("Becky on opticsfast that is me"); GX-103D ("login with MY ID becky"); GX-103G ("I want to send emails to customers via text); GX-103C ("I have 500,000 emails of targeted customers . . . I will spam them soon"); GX-103D ("Marina and Mike and Me" handle Opticsfast phone calls)).

    Although Michael Voller operated the Company while the defendant was in prison, the defendant still received updates on the business and provided advice to Voller during his incarceration. (Tr. at 26:1-24). And the defendant made it clear to his friends that Voller was incapable of running Opticsfast and that Borker intended to assume control of the business. (*See, e.g.*, GX-103J at 19 ("I left Michael in charge of my company after I went to jail"); GX-103Q at 8 ("[I] lost about 2mil in income over last 2 years and now the company is shit and my friend fucked it … you know him MIKE :) the red head."); GX-103F at 14-15 ("mike and me work together ... opticsfast.com … mike been running biz since I left well running isnt the word to use hmmmmmmm ummm into the ground :) … no big deal i will rebuild."); GX-103I at 47-48 ("we are in bad shape.. mike was like al qaeda to my business while I was gone … shot up the entire muder fucking place but i am still breathing we will restructure we will rebuild we will prosper 9/11 … OPTICS STRONG! i can only see these messages in my new terrorism case and you on the stand trying to explain we are kidding."); GX-103A at 21 ("I am fixing site as we speak … my business fell out of the sky and landed on the ground and crashed but its still breathing with a little CPR it will be back I had a site and amazons store but michael was so unreliable I lost money and paused the whole thing. Good thing im back")).

    Moreover, after his release the defendant continued to provide direction regarding Opticsfast's operations. He instructed Opticsfast employees on various aspects of the business, including dealing with customer service. (*See, e.g.*, GX-149B (Email to kristen@opticsfast, writing, "Are you sending the threat to throw away glasses email?"); GX-149D (Email to

kristen@opticsfast.com, writing in response to a transcript of a conversation with a customer, "Everything should be a YES and we deal with problems later"); GX-149E (Email to Opticsfast employees, writing, "Lets [sic] not tell customers that RX takes 2 weeks"); GX-149K (Email to kristen@opticsfast.com cc'ing Voller, writing, "You are NOT sending customers this . . . Did you want me to dispose of your merchandise or did you want to pay the repair invoice?")). The defendant admitted as much in his letter to his probation officer, submitted as Defense Exhibit C. (*See, e.g.*, DX-C at 41 (Borker admitting that he instructed Opticsfast employees)).

There is conclusive evidence from the defendant's own statements and testimony that he had a leadership, management and organizational role at Opticsfast, supervised others at the Company, and received the lion's share of the profits when he partnered with Voller, all of which support the application of this adjustment.

> d.   The Defendant Willfully Obstructed, Impeded, and Attempted to Obstruct and Impede the Administration of Justice

Pursuant to U.S.S.G. § 3C1.1, a two-level enhancement applies because:

> (1) the defendant willfully obstructed, impeded, and attempted to obstruct and impede the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1.  The defendant obstructed justice in at least one of two ways: by submitting false certifications and false documents to the United States Probation Department regarding his employment from the time of his release to just before his arrest; and by repeating his pre-arrest lies in his post-arrest, *Mirandized* interview to federal prosecutors and agents.

"Producing . . . a false, altered, or counterfeit document or record during an official investigation" is but one example from a non-exhaustive list of conduct that constitutes obstruction.  U.S.S.G. § 3C1.1, cmt. n.4C.  Additionally, "providing materially false information to a probation officer in respect to a presentence or other investigation for the court" is yet another example of conduct that constitutes obstruction.  *See* U.S.S.G. § 3C1.1, cmt. n.4H.[21]  Material information means any "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."  *Id.* at cmt. n.6.

While on probation following his release from prison, the defendant submitted certified reports to the United States Probation Office on a monthly basis listing his place of employment

---

[21] It is immaterial whether the production of false records or provision of false information to a probation officer actually obstructs an investigation.  The Second Circuit has "repeatedly rejected the argument that an action taken by a defendant (or statement made by him) with the intent of obstructing justice can constitute obstruction under § 3C1.1 only when it does in fact obstruct or impede the investigation." *United States v. Newton*, 207 F. App'x 22, 25 (2d Cir. 2006) (collecting cases).  It is sufficient that the defendant intended to obstruct the investigation.

as Valentina Accessories, and failing to list either Opticsfast or eMalish Corporation (a corporation that Borker later alleged provided limited services to Opticsfast). (GX-12A-U). The defendant's last certified monthly report falsely listing his employment information was submitted on May 5, 2017, (GX-12U), a few weeks before his arrest in this case on May 25, 2017. These reports were false, and the defendant admitted that he lied to the United States Probation Office "month after month." (DX-C at 15; Tr. at 64:5-23 (Voller testimony); Tr. at 237:24-25-238:1-16 (Borker testimony)).

The defendant additionally drafted and submitted a letter signed by Voller, dated March 30, 2017, approximately two months before his arrest, purporting to explain the services Borker (through eMalish Corporation) provided to Opticsfast. (GX-159). The defendant intentionally omitted from this letter any mention of his involvement in Opticsfast customer service or the fact that he directly engaged with Opticsfast customers. (Tr. at 67:4-13; DX-C at 17). Consequently, the letter did not accurately reflect that the defendant was a partner at Opticsfast—not a subcontractor—nor did it mention the scope of Borker's involvement with the Company. The defendant submitted these false records to deliberately mislead law enforcement.

It is inconsequential whether or not the defendant knew of the investigation or, indeed, whether the federal investigation had even begun at the time he prepared these false documents (though, of course, the investigation was already underway). *See United States v. Ayers*, 416 F.3d 131, 134-35 (2d Cir. 2005) (per curiam) ("[W]e agree not only with the Fourth Circuit, but our other sister circuits that have similarly concluded . . . that it is irrelevant to the first factor of § 3C1.1 whether a federal investigation is underway."); *United States v. Feliz*, 286 F.3d 118, 119 (2d Cir. 2002) (applying enhancement where defendant told witness to lie prior to any arrest or questioning); *United States v. Charria*, 919 F.2d 842, 850 (2d Cir. 1990) ("[P]rearrest destruction of documentary evidence warrants § 3C1.1 increase as guideline applies to obstructive conduct both before and after initiation of formal proceedings against defendant." (citing *United States v. Irabor*, 894 F.2d 554, 556 (2d Cir. 1990)); *United States v. Maurer*, 76 F. Supp. 2d 353, 359-60 (S.D.N.Y. 1999) (applying § 3C1.1 enhancement to intimidation of potential witnesses before any investigation had even begun).

Second, after the defendant's arrest, he continued lying to federal agents and prosecutors consistent with his pre-arrest falsehoods. "[C]oncealing . . . evidence that is material to an official investigation or judicial proceeding" also constitutes obstruction. U.S.S.G. § 3C1.1, cmt. n.4D. In his post-arrest, *Mirandized* interview, the defendant denied working at Opticsfast, concealed his role as the founder of Opticsfast, and obscured the fact that he engaged with Opticsfast customers.[22] False statements to law enforcement can constitute concealment of material evidence. *See United States v. Martin*, 737 F. Supp. 819, 824 (S.D.N.Y.), *aff'd*, 923 F.2d 846 (2d Cir. 1990) (applying obstruction enhancement for defendant's false statement in a post-arrest interview denying knowledge of a bank robber's identity because it constituted "concealing material evidence"). Such actions constituted further obstruction of the investigation.

---

[22] (*See* GX-2 at 1:57-2:34; 2:50-3:13; 3:36-4:45; 6:42-6:57; 7:00-7:55; 15:58-16:02; 16:33-17:15; 19:25-19:35; 21:30-21:40; 28:01-28:19; 30:56-31:18; 32:30-32:45; 38:36-39:09; 40:48-40:58; 41:31-41:42; 44:30-44:50).

It is undisputed that the defendant lied to the U.S. Probation Office regarding his employment and lied to federal agents and prosecutors after his arrest.  The Second Circuit has found intent "where the underlying facts are undisputed . . . and the facts support the 'virtually inescapable' conclusion that the defendant must have acted with the requisite intent."  *Feliz*, 286 F.3d at 121.  The defendant does not dispute that he lied, and the facts make plain that the defendant acted with intent to obstruct justice.  Consequently, the Court should apply this adjustment in calculating the defendant's Guidelines range.

### e.   The Defendant Is Not Entitled to Any Reduction for Acceptance of Responsibility

The defendant is not entitled to a reduction in his offense level pursuant to U.S.S.G. § 3E1.1(a) because he has not clearly demonstrated acceptance of responsibility through his allocution and subsequent conduct prior to the imposition of sentence.  To the contrary, the defendant has remained steadfast in his efforts to minimize his criminal conduct, including by denying that his fraud extended to Opticsfast's eyewear repair business in his written submission to the Court and while testifying at the Hearing.  Not content to merely deny much of his own conduct, he has gone so far as to allege that one of his victims perjured herself during the Hearing.

An acceptance of responsibility adjustment to the Guidelines calculation is not guaranteed: a defendant "who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."  U.S.S.G. § 3E1.1, cmt. n.3; *see also United States v. Kumar*, 617 F.3d 612, 635 (2d Cir. 2010) (noting that a defendant who is found to have obstructed or impeded justice "ordinarily would not be entitled to the reduction" (citing U.S.S.G. § 3E1.1(a), cmt. n. 4 (internal quotation marks omitted))).  The Second Circuit has affirmed a sentencing court's denial of a reduction for acceptance of responsibility where the defendant crafted a "carefully worded plea allocution . . . [that] muted the gravity of his complicity in the . . . fraud offenses."  *Kumar*, 617 F.3d at 635; *see also United States v. Brennan*, 395 F.3d 59, 75 (2d Cir. 2005), *as amended on denial of reconsideration*, 406 F.3d 113 (2d Cir. 2005) (affirming denial of credit for acceptance of responsibility where defendant "repeatedly sought to minimize or conceal the extent of his guilt by grossly misstating the facts").  Further, a "defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility" and is therefore not entitled to this reduction.  U.S.S.G. § 3E1.1(a), cmt. n. 1(A); *see, e.g., United States v. Rivera*, 96 F.3d 41, 43 (2d Cir. 1996) (upholding denial of § 3E1.1 reduction where defendant had not shown "contrition and candor").

Here, unlike with his Decormyeyes scheme, the defendant allocuted to having engaged in a shipping label fraud scheme only.  (Plea Tr. at 18:19-25-19:14-19).  The defendant has denied entirely that he perpetrated a fraud against hundreds of people, resulting in more than $40,000 dollars of loss, and instead seeks to take responsibility only for a loss of less than $800.  (*See generally* DX-C; Tr. at 210:24-25-211:1; 257:22-25-258:1-6; 272:6-25).  In his attempt to evade responsibility for his conduct, the defendant has taken fairly astonishing positions, including that the false statements he deliberately posted on Opticsfast's website were on "fluff" pages that customers did not read, (Tr. at 248:6-9, 249:9-12, 254:20-25), and that the defendant was justified in advertising an "in-house" repair lab because Opticsfast had contracted with a third-party vendor that picked up and dropped off glasses for repair, (Tr. at 242:22-25-243:1-14, 244:18-25-245:1-4).

Moreover—just as he argued at his Decormyeyes *Fatico* hearing and on appeal in that case—the defendant has accused his victim, Ms. McGriff, of committing perjury. (Tr. at 284:23-25) (Question: So just to be clear, you're saying that Ms. McGriff wasn't telling the truth when she was here? Defendant: She lied, yes."). This baseless attack on the credibility of the only victim-witness called by the Government is further proof of the defendant's "persistent refusal to accept responsibility for his crimes."[23] *United States v. Borker*, 525 F. App'x 55, 58 (2d Cir. 2013). In Borker's appeal of his sentence for his Decormyeyes-related fraud, the Second Circuit affirmed the district court's finding that Borker was not entitled to a reduction for acceptance of responsibility in large part because Borker denied having threatened sexual violence against two victims, and attacked the credibility of a live witness who received such threats. *Id.* at 57. The same result is warranted here.

Finally, the defendant continues to frivolously contest the factual basis for Guidelines enhancements. For example, despite ample evidence to the contrary, the defendant—a self-proclaimed "partner" in Opticsfast who essentially oversaw all aspects of the Company's operation—contests that he was a leader, supervisor, organizer, or manager of the business. *See supra* Part IV.c. There is no foundation for his persistent denials. In sum, the defendant's statements and conduct are wholly inconsistent with acceptance of responsibility, and he is consequently not entitled to any reduction pursuant to pursuant to U.S.S.G. § 3E1.1(a).

> f.  The Government Does Not Intend to Move at Sentencing for an Additional One-Level Reduction.

The Guidelines provide:

> If the defendant qualifies for a decrease under [U.S.S.G. § 3E1.1(a)], the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, [the Court may] decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1(b). As set forth above, the defendant has not accepted responsibility for his conduct, does not qualify for a decrease in offense level pursuant to U.S.S.G. § 3E1.1(a), and therefore also does not qualify for an additional one-level decrease pursuant to U.S.S.G. § 3E1.1(b).

---

[23] Borker accused Ms. McGriff of lying even though he testified that he "wasn't responsible" for her repair order, did not "know anything about [her] order," and "never dealt with her at all." (Tr. at 281:10-11).

**\*\*\*\***

      Wherefore, the Government respectfully requests that the Court sentence the defendant to a sentence within the Guidelines range of between 51 to 63 months' imprisonment.

                  Respectfully submitted,

                  GEOFFREY S. BERMAN
                  United States Attorney

By:     _____
                 Jeffrey Coffman/Sarah Mortazavi
                 Assistant United States Attorneys
                 (212) 637-2263/2520

cc: Dominic Amorosa, Esq., Counsel for Defendant (via ECF)