# DOMINIC F. AMOROSA

ATTORNEY-AT-LAW
244 FIFTH AVENUE, SUITE A246
NEW YORK, NEW YORK 10001
212 406 7000

Email: lawoffices@dfamorosa.com


June 25, 2018


Hon. Paul G. Gardephe
United States District Judge
Foley Square
New York, New York 10007


Re:  **United States v. Borker**, 17 CR 391 (PGG)


Dear Judge Gardephe:


This letter is respectfully submitted in connection with sentencing and in response to the Government's letter of June 15, 2018.  The Government has exaggerated Defendant's criminal conduct and has ignored authorities which undermine its position on the Guidelines. Specifically, as the hearing showed, Opticsfast ("OF") was a business that completed and shipped to customers, from 2011 to May 25, 2017, 13,622 repair orders, of which there were approximately 200 repair related complaints (Tr.82).  The ratio of complaints (and there is no evidence that the complaints themselves were the product of fraud) to successfully executed repairs is a staggering 0.0146.  For the Government to claim widespread fraud in these circumstances is an egregious overreach.

**Background**

1

On December 6, 2010, Defendant was arrested for fraud and for making threats against customers of Decormyeyes ("DME"), a company Defendant then owned. DME sold glasses online as well as did repairs for customers. This company and its unlawful practices drew the attention of regulators in late 2010. When Defendant realized that DME was tainted, prior to his arrest on December 6, 2010, he became involved in the formation of OF which was designed to engage in the same business as DME.  However, there was a major difference.  Defendant was intent upon operating at OF an honest business, as opposed to what he had done at DME.   Here is what Defendant wrote on November 25, 2010 to employees after he realized the regulators were on to him shortly before his arrest:

> "If they want a refund, I will give them a refund.  If they want a return with no restocking fee, I will do it.   I am not going to lie to customers about the availability when item is DC [discontinued]. No more shipping them wrong color and damaged shit from ebay.  No more fucking them over when they ask for a refund.  No more cursing and getting them all mad at me." (Tr. 288; GX28). [1]

Defendant, having been arrested and detained on December 6, 2010, was released on bail on the DME case on April 27, 2011.  While on bail Defendant operated the OF website business.  He pleaded guilty on May 12, 2011 to making threats and to mail and wire fraud during the period prior to his arrest. Defendant was remanded on the DME case on July 11, 2012.  On September 6, 2012, Defendant was sentenced by Judge Sullivan to four years' imprisonment to be followed by supervised release of three years.

Judge Sullivan found that the fraud loss was $46,146 notwithstanding the fact that DME generated millions of dollars in revenue and income over a period of years.   In short, Defendant's major crimes in this earlier case involved threats, not fraud.  These threats were not motivated by a desire to obtain money fraudulently.  They were motivated by compulsive sickness aggravated by alcohol for which Defendant has been severely punished.

---

[1]  This is consistent with the statement that Michael Voller made to Defendant on tape in a telephone call shortly after Defendant was jailed on May 25, 2017: "you fucked up in the past and it has nothing to do with the present. You're a better person." (Tr.76; Ex. A); see page 6, infra.

From April 27, 2011 to July 11, 2012, while Defendant was on bail on the DME case, and while he was operating OF, there were 24,662 orders placed with OF, of which 5,206 were repair orders. In this period there were only 84 complaints made with the Better Business Bureau("BBB") of which only 24 were repair related. This is the opposite of a fraudulently operated business.

After Defendant was remanded on the DME case on July 11, 2012, Michael Voller, Defendant's friend for many years, took over the operation of the OF business. From the time Defendant was remanded on July 11, 2012 until the time of his release in March 2015, while Michael Voller was operating OF, 217 BBB complaints were filed against OF, and of these 217 only 99 were repair related.

When Defendant was released from prison in March 2015 on the four-year sentence, he began once again to operate, along with Michael Voller, the OF online business. He was then on supervised release. Unfortunately, while on supervised release, Defendant concealed from his probation officer the full extent of his involvement with OF. He did this because he was afraid that if he revealed the full extent of his involvement with OF, he would not be allowed to participate in the operation of the business, which is the only thing he knew how to do. He did not conceal his participation in OF because he wanted to defraud customers. It was this concealment which caused Defendant to be charged with violating the conditions of his supervisory release for which he was recently sentenced by Judge Sullivan to two additional years in prison.

When Defendant returned to work for OF in March 2015, he did not intend to defraud anyone and did not do so with the minor exception, beginning in January of 2016, of the shipping label issue, a fraud which amounts to approximately $763 in losses to customers.

**The Hearing on the Defendant's Violations of his Supervisory Release**

Before addressing the factual and legal disputes, it is important for the Court to understand that Defendant has already been sentenced by Judge Sullivan for his criminal conduct in this case. Defendant was arrested on May 25, 2017 on the fraud charges made here. Shortly thereafter he was charged with violations of the conditions of his supervisory release. The specifications alleged in the supervisory release proceeding including the mail fraud, wire fraud and conspiracy charges made in the Indictment. Judge Sullivan found by a

preponderance of the evidence that Defendant was guilty of these specification in addition to two other specifications alleging that Defendant lied to his Probation Officer, and one specification that Defendant did not accurately inform the Probation Department of his actual income. Judge Sullivan sentenced Defendant to two additional years in prison on these violations. He is serving that sentence at this time which began on June 5, 2017.

**The Fraud Here Was Not as Expansive as Alleged by the Government**

While there are several issues in dispute the most important is the extent of the fraud in this case.  To be guilty of mail fraud and wire fraud a defendant must make, or aid in making, false representations to obtain money with the specific intent to harm and injure victims.  Here, Defendant did do this but his fraudulent conduct was limited to the shipping label situation in which customers were falsely told that they had to reimburse OF for the cost of unused shipping labels, when OF actually had no cost.  The Government's position that every single repair customer who made a BBB complaint was a victim of fraud is baseless and unsupported in this record.

As noted, OF successfully filled 13,622 repair orders from 2011 to May 2017 when Defendant was arrested.  The number of BBB and other complaints was approximately 200.[2]  This statistic alone shows there was no expansive fraud in this case.  Why would Defendant or Michael Voller form an intent to defraud an infinitely small number of customers?  It makes no sense.  What happened here in respect to some of the customers' complaints is what OF wrote in an email to Government witness, Renada McGriff, on November 28, 2016 in response to her complaints that she did not received the repairs she ordered and that she was being cheated:

> Email not going to resolve anything.  Item in lab and until lab returns to me I cant [sic] fix any issues.  There are thousands of repairs in the system and

---

[2]  Attached as Exhibit 1 to this letter is Item 23 from Defendant's Exhibit B, introduced at the Fatico Hearing, which reflects data base information relating to all transactions by OF from July 2, 2011 to May 25, 2017.  There were 4,465 refunds issued in this period.  Also, importantly, there were 5,111 repair orders which could not be repaired and the glasses sent back to customers. And there were 280 orders that were abandoned by customers, that is, these customers sent in thier glasses and had no further contact with OF. This last statistic is relevant in respect to OF emails to some of these customers asking them if they wanted OF to discard their glasses.

thousands of shipped orders that go perfect. Sometimes there are issues. This order is 1 of them. (GX 137).

There is no question that Ms. McGriff's order was botched, but what happened was not the product of fraud, but rather of mistake.[3]

Michael Voller's testimony supports the conclusion that the fraud was very limited. On cross examination he testified that he did not know he was committing fraud in real time but rather only came to this odd conclusion after he was arrested (Tr. 74). One cannot commit fraud, requiring a specific intent to injure and harm another by false representation, and not know it. That is the opposite of mens rea. This man's testimony was the product of an attempt to avoid prison by saying what he thought the Government wanted him to say.

Voller gave the following testimony when asked what he told me after Defendant's arrest in respect to whether he and Defendant had done anything wrong:

> "When I first met you, I was under the impression we weren't committing any crimes." (Tr. 69).

He was then asked:

> "At that time, in that period, after Borker was arrested, you did not believe you had engaged in any criminal conduct while you work working at Opticfast, right?
>
> A: That correct.

Tr. 69

---

[3] Renada McGriff's testimony that she was threatened by someone at OF who said to her, "I know where you live", was false. This was a threat which Defendant made to a customer in his first case which was widely reported in the press. Ms. McGriff was interviewed many times about her contacts with OF, including by the New York Attorney General which declined to pursue her case. There are Ninety- Nine (99) 3500 exhibits for this witness (GX 3506-1 to 3506-99, although many are duplicative) all of which were admitted into evidences in which she recounts her history with OF   Not a single one, except the last one, refers to the threat she claimed was made against her on the witness stand. The Government stated on the record at the hearing that indeed she had never told the Government of this threat before. For example, attached to this letter as Exhibit 2 is Renada McGriff's complaint made with the Attorney General which does not mention the alleged threat.   On another issue, the email to Ms. McGriff also shows that OF did not conceal the fact that it was sending repairs to an off-site repair service. In fact, Defendant's Exhibit G in evidence at the hearing contained a number of emails to customers also stating explicitly that their items were "back from the lab".

And when Mr. Voller spoke to Defendant a day or two after Defendant's incarceration on June 5, 2017 the following occurred on tape:

> V: I want to get you out, Dude
>
> B: I want to get out also.  I didn't do anything wrong.
>
> V: I know
>
> B: I don't deserve to be here
>
> V: I know
>
> B: I hope Dominic could explain it.
>
> V: I hope the system could see that.
>
> B: I hope so too.
>
> V:You Fucked up in the past and it has nothing to do with the present.  Your a better person.  Tr. 76. eX A
>
> B: Better person or not a better person.  I didn't do anything wrong.
>
> V: I understand that but that's not …no one did anything wrong.  That's why its bothering me.  It's bothering me that nobody understands that.
>
> B: They will at some point.

(Tr.  73; Ex. A).

How could Michael Voller be making these statements if he and Defendant were involved in the expansive fraud the Government claims?   Not surprisingly, the Government ignores this proof.   Engaging in unethical conduct is not the same as engaging in fraudulent conduct requiring a specific intent to injure and harm victims.

Nor do the affidavits submitted by Government written by unhappy customers prove expansive fraud.  For example, an affidavit submitted by a customer asserted she was the victim of fraud based upon the defective eyewear she received from OF, which she excitedly claimed she did not order.  However, an

email to her from OF, dated January 26, 2017, stated what really occurred with this customer:

> Call me. And CALM down!! These are not your glasses…. I [sic] seems someone made a mistake and shipped someone elses [sic] glasses. I understand why you are upset. (GX 117).

Mistakes do not amount to fraud. Many of these customers who submitted affidavits jumped to the conclusion that there was fraud involved, as opposed to botched orders, when they learned that Defendant had a prior criminal record. The Government made the same mistake. That Defendant engaged in fraud years earlier does not mean he did so with OF. Indeed, Defendant's earlier conduct and the severe punishment he received because of it taught him a lesson he did not forget.[4]

At the hearing relating to Defendant's violation of the conditions of his supervised release, the Government presented the very same affidavits it presents now. Here is what Judge Sullivan found relating to these affidavits:

> Yes, that's where the facts alleged come from, but many of these complaints detailed poor service, threatening or inappropriate e-mails and phone calls, verbal abuse and discrimination, and those are not really— that's not really about fraud. (Tr. Hearing, Jan.19, 2018, p. 164).

Also, even though the Government introduced numerous complaints made to the BBB, and now asserts that they all should be viewed as evidence of fraudulent conduct, the Government witness, Agent Borofsky, acknowledged that only the initial complaint was submitted in evidence and not the response by OF or whether the customer was satisfied with the response. Indeed, these customers, for all that is known, may have been perfectly content with the responses made by OF, especially if a refund was provided. The Court should note that 4,465

---

[4] Attached to this letter as Exhibit 3 is a memo prepared by Defendant responding to most of the affidavits submitted as Government Exhibits. Needless to say, without cross examination, statements in these affidavits should not be controlling.

refunds were provided to customers according to the data base. (Ex. 1 to this letter)

The Government's failure to submit into evidence the follow up to the initial BBB complaints also undermines the Government's position in respect to what happened in each case as well as the amount of losses in this case, even assuming there was a wider fraud. The Court specifically instructed the Government to expand the record on this issue. The Court stated:

> Yes, I think you're going to have to [give more detail on losses] because there are a number of points in the agent's testimony where I think she conceded that either a refund had been made or made other concessions that put into question that amount. (Tr. 299-300)[5]

**Defendant's non material False Statements Do Not Warrant an Enhancement for Obstruction of Justice**

It is certainly true that Defendant lied to the Probation Department when he informed it, while he was on supervised release, that he worked at Valentina Associates. However, what the Government fails to mention is that Defendant also told the Probation Department, which was memorialized in writing, that he was a partner in OF with Mr. Voller, and that he in fact was in contact with customers of OF. Thus, on May 18, 2016 a Probation Report reflects that the "subject also reported that he has been assisting Mr. Michael Voller with the selling of his inventory of sunglasses on Mr. Voller's website. The subject claimed that, while he mostly performs data entry, he also reported to have some customer contact." (Ex.5)

Another report, dated, October 24, 2106, reflects that Defendant "stated that his business partner deals exclusively with customers, while he simply handles the 'back end' of the business, …". (Ex.5, page 2).

---

[5] Attached as Exhibit 4 is a portion of a BBB report which reflects OF response to a complaint made by a customer. OF replied to the complaint by stating: "We have thousands of happy customers and work with a lab that fixes 1200 a week. All can be proven if needed. You are just one of the unfortunate issues that do not happen when servicing thousands. If you don't want to send it back. Nothing we can do. We tried!" This is the kind of prove that should have been placed in the record by the Government for all BBB complaints. This document was provided by the Government in discovery. Why was it not introduced in evidence? Further, this statement shows once again that customers were not lied to about the fact that OF was using an outside lab to do repair work.

These disclosures certainly undermine the claim that Defendant was concealing his involvement in OF from the Probation Department.

The Government also alleges that Defendant lied to the agents after his arrest on May 25, 2017 on the charges here, when he was interrogated in the absence of his counsel in violation of his sixth amendment rights.  It is unclear, given the fact of Defendant's earlier disclosures to the Probation Department, and that the agents were aware of these, what exactly the Government is relying upon to show that Defendant lied to the agents, or a specific intent to obstruct justice, which is required before this enhancement can be applied.[6]  How could Defendant have intended to obstruct justice if he previously disclosed to the Government the truthful facts?  How was the investigation obstructed if the agents knew the truth?

The comment section to Section 3C1.1 of the Guidelines excludes as an enhancement for obstruction of justice the "making of false statements, not under oath, to law enforcement officers" unless the false statement "significantly obstructed or impeded the official investigation or prosecution."   False statement made by Defendant do not meet this standard, and the Government has chosen not even to address this issue.   The cases are numerous disallowing an enhancement in this kind of circumstance.  See Unites States v. Brown, 321 F. 3d 347, 351 (2d Cir.2003 )(It is "essential" that a court applying this enhancement make "a finding that the defendant had the specific intent to obstruct justice, i.e. that the Defendant consciously acted with the purpose of obstruction justice"); United States v. Bradbury, 189 F. 3d 200, 205 (2d Cir. 1999) (It is not sufficient merely to find that the defendant made a materially false statement concerning his offense conduct.); United States v. Archer, 671 F. 3d 149 (2nd Cir. 2011) (no obstruction enhancement for text messages to cooperating witness); United States v. Cunavelis, 969 F.2d 1419 (2d Cir 1992)(Obstruction of justice has stricter standard than preponderance); see also United States v. Bliss, 430 F.2d 640 (2d Cir. 2005); United States v. Canova, 412 F.3d 331 (2d Cir. 2005); United States v. Woodard, 239 F.3d 159 (2d Cir 2001); United States v. Ruggiero, 100 F. 3d 284 (2d Cir. 1996); United States v. Williams, 79 F. 3d 334 (2d Cir. 1996); United States v.

---

[6] The Government asserts that Defendant was interviewed by agents and prosecutors.  As the Court knows from the hearing on this uncounseled interrogation, there were no prosecutors present.

Catano-Alzate, 62 F.3d 41 (2d Cir.1995); United States v. Johns, 27 F. 3d 31 (2d Cir. 1994); United States v. Lew, 980 F.2d 855 (2d Cir. 1992).

We also note that in its first Pimentel letter of June 14, 2017 the Government did not assert that an obstruction of justice enhancement was proper. At the very least the Government should be required to explain its changing position. This suggests that the Government's current position is one designed to punish Defendant for asserting his right to a Fatico hearing.

Finally, Defendant has already been punished by Judge Sullivan for lying to the Probation Department.

**A Three Point Enhancement Under Section 3C1.3 is Illegal**

The Government takes the extraordinary position, which not even the PSR adopts, that a 3-point enhancement is warranted because Defendant committed part of the offence "while on pretrial release" in another case. The Government cites no authority of this position. Indeed, the authority is to the contrary. See United States v. Yates, 973 F. 2d 1 (1st Cir. 1992), holding that an enhancement for obstruction of justice is not permissible if the obstruction occurred in another case. The same reasoning applies to an enhancement for committing an offense while on bail in another case.

Moreover, as pointed out in my letter to the Court of May 7, 2018, the Government's position would doubly count guidelines, something that is expressly prohibited. This is because Defendant is subject to a two-point increase in his Criminal History score under section 4A1.1(d) based upon the fact that he committed the instant offense while under the earlier sentence imposed by Judge Sullivan of four years, to be followed by three years of supervised release. This provision has increased Defendant's guideline at it has placed him in Category III, rather than Category II. The Government now wants to increase it further on the same facts.

Importantly, furthermore, there is no proof that Defendant committed crimes while on bail in his earlier case. He was on bail in the first case from April 27, 2011 to July 12, 2012. While he was working for OF in this period, the business was being properly conducted. As noted earlier, in this period there were 24,662 executed orders and only 84 BBB complaints. And as shown already customer

complaints do not equate with fraudulent conduct. There is nothing in this record to show that these complaints were not settled satisfactorily to the customers.

Finally, the Government relies on the fact that OF website stated that all repairs were done in house when in fact OF used outside firms to do some repairs. But there is no proof in the record as to whether any customers read this statement on the website, let alone believed it was important. Certainly no affiant has complained that the problem was that his or her glasses were sent to a subcontractor to be fixed. Rather, they complained that their glasses were not fixed to their satisfaction. The real issue is the competency of the work done and the Government has not even argued that the out-side repair labs were not professionally operated. Importantly, this kind of statement, even if false, was certainly not material to the bargain, even if read by a customer.

In United States v. Regent Office Supply Co., 421 F. 2d 1174 (2d Cir. 1970), the Court stated the following:

> The important substantive question on this appeal is: Does solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, constitute a "scheme to defraud' or "obtaining money by false pretenses' within the meaning of 18 U.S.C. section 1341? We hold that, as here presented, it does not and the convictions should be reversed.

Here, there is not a shred of evidence suggesting that the contractors used by OF to perform repair work were anything other than experts in eyewear products.

Finally, not only do non-material false statements fail to make out an offense, but puffing statements, such as "we are the best", "we can fix anything", even if the company is not in fact the "best", and even if the company cannot in fact fix everything, certainly do not either.

**There Should Be No Managerial Role Enhancement**

Like other positions in this case, the Government is a moving target in respect to whether Defendant is subject to an enhancement for a managerial role in this case. The Government first argued that he supervised five or more participants in the offense and therefore should be subject to a 3-point enhancement. The Government then withdrew this as it was plainly frivolous. The Government's fall

11

back position is that Defendant was a supervisor in the offense and therefore the enhancement should be 2-points under 3B1.1(c). This too is erroneous. This was a relatively minor fraud, approximately $700. Although it was Defendant's idea to misrepresent the facts to the customers, he did supervise anyone to help him. Michael Voller was the only person who agreed with Defendant to do this, but Mr. Voller was Defendant's partner and as such should not be found to have been someone supervised by Defendant. No role adjustment should be made for individuals of roughly equal culpability. See <u>United States v. Katora</u>, 981 F. 2d 1398, 1402 (3d Cir. 1992) finding a 3B1.1 enhancement inapplicable when two participants "bear equal responsibility for 'organizing' their own commission of a crime." <u>See also United States v. Fuentes</u>, 954 F. 2d 151, 153 (3d Cir. 1992) (control must be exercised over at least one other participant; shared responsibility is not enough).

**Acceptance of Responsibility**

The Government argues that Defendant should be denied credit for acceptance of responsibility because he denied his guilt with respect to the expansive fraud the Government alleges. Given that the Government's own witness, Mr. Voller, also essentially denied his guilt by testifying he was not aware he was engaging in fraud while working at OF, the Government's positions is strikingly ironic. For, like Voller, Defendant also was not aware he was engaged in fraud. This includes the Government's claim that the website falsely stated that all repairs were done in house. Mr. Voller not only did not think this raised a problem in real time, but he testified that he did not remove the language from the OF website, where incidentally he is still working, until a few days before his testimony.

Defendant should of course be given credit for acceptance of responsibility. He elected to plead guilty and waive many defenses in this case, including factual and legal. This issue has also been addressed in my letter to the Court of May 8, 2018 which I request the Court review once again. This letter also outlines the reasons why a downward departure is called for in this case. It also presents letters submitted to the Court on Defendant's behalf, including a critical one from his girlfriend who recently gave birth to Defendant's second son.

**Conclusion**

The Government has made many errors in its letter. For example, it claims Defendant lied to prosecutors as well as agents after his arrest on May 25, 2017. This is not true.  Only agents were present.  This is not a non-material error. This erroneous statement would have taken Defendant's statements out of the exception to the Comments to the Guidelines for the obstruction of justice enhancement.   Further, the Government asserts that the website falsely advertised that OF could repair REVO glasses, Titanium Glasses and also do Welding repair work.   However, the data base shows that there were 480 REVO repairs done, 223 Titanium Repairs done and 236 Welding repairs done.   The Government had not done its homework.


Respectfully submitted,


_____/s/_____

Dominic F. Amorosa