UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

VITALY BORKER,

Defendant.

**MEMORANDUM
OPINION & ORDER**

17 Cr. 391 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Vitaly Borker has pleaded guilty to mail fraud, in violation of 18

U.S.C. § 1341; wire fraud, in violation of 18 U.S.C. § 1343; and conspiracy to commit mail and

wire fraud, in violation of 18 U.S.C. § 1349, and awaits sentencing.  Borker raised a number of

factual issues concerning the nature of his criminal conduct, and the Court conducted a Fatico

hearing on May 23 and 31, 2018.  The parties dispute the application of Sentencing Guidelines

provisions regarding (1) loss amount; (2) role in the offense; (3) obstruction of justice; (4)

commission of offenses while on pretrial release; and (5) acceptance of responsibility.  (See June

15, 2018 Govt. Br. (Dkt. No. 93); June 25, 2018 Def. Br. (Dkt. No. 94))  For the reasons stated

below, this Court concludes that (1) no enhancement premised on loss amount is appropriate; (2)

adjustments for role in the offense and obstruction of justice are appropriate; (3) an adjustment

for commission of an offense while on pretrial release is not appropriate; and (4) Borker is not

entitled to a reduction for acceptance of responsibility.

## BACKGROUND[1]

### I.   THE PRIOR PROSECUTION OF BORKER AND THE VIOLATION OF SUPERVISED RELEASE PROCEEDING

In 2010, Borker was charged with cyberstalking, transmitting threatening communications in interstate commerce, mail fraud, and wire fraud in connection with his operation of DecorMyEyes.com ("DecorMyEyes"), an online eyewear retailer.  (See United States v. Borker, 10 Cr. 1266 (RJS), Indictment (Dkt. No. 5))  In that case, the Government alleged that Borker defrauded DecorMyEyes customers by misrepresenting the authenticity and condition of the merchandise customers purchased and by charging customers unauthorized fees. The Government also alleged that Borker threatened customers by email and telephone.  (Id.) On May 12, 2011, Borker pled guilty to transmitting threatening communications in interstate commerce, mail fraud, and wire fraud (see id., May 12, 2011 Plea Tr. (Dkt. No. 50)), and on September 6, 2012, Judge Sullivan sentenced Borker to 48 months' imprisonment and three years' supervised release.[2]  (Id., Judgment (Dkt. No. 99))

In a May 19, 2017 criminal complaint, the Government charged Borker with mail and wire fraud in connection with his operation of Opticsfast.com ("Opticsfast"), another online eyewear retailer.  (Cmplt. (Dkt. No. 1))  According to the Complaint, Borker – since at least July 2011 – has engaged in a variety of fraudulent conduct through the Opticsfast website, including selling customers "defective, damaged, used, or counterfeit" eyewear; not repairing or further damaging eyewear delivered to Opticsfast for repair services; refusing to refund purchases; charging unauthorized restocking fees; charging for shipping labels advertised as pre-paid; and

---

[1]  The page numbers in this Order refer to the designated page numbers in this District's Electronic Case Filing (ECF) system.

[2]  Judge Sullivan also imposed a $50,000 fine and ordered Borker to pay restitution in the amount of $46,146.23.  (10 Cr. 1266 Judgment (Dkt. No. 99))

failing to send eyewear to customers who had paid for their purchase.   (Id. ¶¶ 4, 8, 9)  The

Complaint further alleges that Borker subjected customers who attempted to return merchandise

"to a campaign of abusive emails and text messages, often using aliases."  (Id. ¶ 4)

Borker and co-defendant Michael Voller were later charged in an indictment with

mail fraud, wire fraud, and conspiracy to commit mail and wire fraud.   (Indictment (Dkt. No. 9))

Voller – who allegedly helped run Opticsfast – is now a cooperating witness.

When Borker was arrested in May 2017 on the instant case, he was still serving

his term of supervised release in 10 Cr. 1266.  Accordingly, the Probation Office filed a violation

of supervised release petition against Borker in that case.  At a June 5, 2017 conference before

Judge Sullivan, Borker denied the specifications in the violation petition, and was ordered

detained pending a hearing.  (See June 5, 2017 Hearing Tr., 10 Cr. 1266 (Dkt. No. 130) at 3, 44)

The Probation Office ultimately lodged the following six specifications against

Borker:

1. From on or about July 2011, until the present, in the Southern District of New York, the Releasee committed a Federal crime, mail fraud, third degree, in violation of 18 USC 1341 and 2, a Class C felony, in that the Releasee defrauded customers of his retail eyewear website, "Opticsfast.com," by misrepresenting the authenticity and condition of merchandise he sold and mailed to customers. . . .

2. From on or about July 2011, until the present, in the Southern District of New York, the Releasee committed a Federal crime, wire fraud, third degree, in violation of 18 USC 1343 and 2, a Class C felony, in that the Releasee defrauded customers of his retail eyewear website, "Opticsfast.com," by misrepresenting the authenticity and condition of merchandise he sold and mailed to customers. . . .

3. From on or about July 2011, until the present, in the Southern District of New York, the Releasee committed a Federal crime, conspiracy to commit wire and mail fraud, 18 USC 1343, a Class C felony, in that the Releasee defrauded customers of his retail eyewear website, "Opticsfast.com," by misrepresenting the authenticity and condition of merchandise he sold and mailed to customers. . . .

3

4. On or about March 29, 2017, the Releasee violated Condition #3 of the rules and conditions of supervised release, *"The Defendant shall answer truthfully to all inquiries by the Probation Officer and follow instructions of the Probation Officer,"* in that the Releasee denied that he was the owner/operator of Opticsfast. . . .

5. On or about March 29, 2017, and March 31, 2017, the Releasee violated Condition #3 of the rules and conditions of supervised release, *"The Defendant shall answer truthfully to all inquiries by the Probation Officer and follow instructions of the Probation Officer,"* in that the Releasee denied any interaction with customers while selling his sunglasses. . . .

6. On or about January 23, 2017, the Releasee violated Condition #3 of the rules and conditions of supervised release, *"The Defendant shall answer truthfully to all inquiries by the Probation Officer and follow instructions of the Probation Officer,"* in that the Releasee provided the Probation Department with falsified tax returns. . . .

(10 Cr. 1266, Jan. 9, 2018 Third Amended Request for Court Action; Jan. 19, 2018 Hearing Tr.

(Dkt. No. 169) at 6)

On January 19, 2018, Judge Sullivan conducted a hearing concerning Borker's

alleged supervised release violations.   At the hearing, the Government called three probation

officers and two postal inspectors, and also introduced numerous affidavits from Opticsfast

customers.  (See 10 Cr. 1266, Jan. 19, 2018 Hearing Tr. (Dkt. No. 169))  At the conclusion of the

hearing, Judge Sullivan announced that the Government had proven Specifications Four and Five

– which concerned Defendant's false statements to probation officers about whether he was the

owner or operator of Opticsfast and whether he interacted with customers – and reserved

decision concerning the other four specifications.  (10 Cr. 1266, Order (Dkt. No. 168) at 1)  In a

February 5, 2018 order, Judge Sullivan concluded that the Government had also proven the

remaining four specifications.[3]  (10 Cr. 1266, Order (Dkt. No. 168) at 1-2)  On February 22,

---

[3]  As to those specifications alleging that Borker had committed mail and wire fraud, Judge Sullivan found that "Opticsfast misrepresented what kinds of repairs it could perform, what kinds of facilities it possessed, what repairs would cost, and how long they would take in order to

2018, Judge Sullivan sentenced Borker to two years' imprisonment for his violations of

supervised release conditions.[4]  (10 Cr. 1266, Judgment (Dkt. No. 174))

## II.   BORKER'S GUILTY PLEA IN THE INSTANT CASE

On March 14, 2018 – shortly after Borker was sentenced for his supervised

release violations in 10 Cr. 1266 – the Government provided Borker with a Pimentel letter

concerning the charges in the instant case.  In the Pimentel letter, the Government asserted that

Borker's offense level is 20, his Criminal History Category is III, and the applicable Sentencing

Guidelines range is 41 to 51 months' imprisonment.  (Mar. 14, 2018 Govt. Ltr. at 2-3)  As to

offense level, the Government offered the following analysis:

1.  The three counts alleged are grouped together because the offense level is determined largely on the basis of loss amount;

2.  The base level offense is 7, because the statutory maximum period of imprisonment for the offense is 20 years or more;

3.   The loss amount exceeds $40,000 but is less than $95,000, resulting in a six-level enhancement;

4.  A two level-enhancement applies because the offense involved ten or more victims;

5.  A three-level enhancement applies because Borker was a supervisor of manager and the criminal activity involved five or more participants or was otherwise extensive;

---

induce customers to hand over their glasses."  (10 Cr. 1266, Order (Dkt. No. 168) at 3)  Judge
Sullivan further found that, "at the very least, customers who made inquiries regarding the cost
of repairs would be charged $5.49 for a shipping label that was never used and which cost
OpticsFast virtually nothing."  (Id. at 2)

[4]  Judge Sullivan found Borker's lies to the Probation Office more significant than the fraud he
had perpetrated at Opticsfast: "Candidly, this strikes me as a fairly small-bore fraud.  Maybe the
government at the trial before Judge Gardephe will develop much more losses and damages and
victims.  But for me the truly compelling violations are the way that you manipulated and lied to
probation in order to get around my clear conditions of supervised release in order to go right
back to the business that you had been in before."  (10 Cr. 1266, Feb. 22, 2018 Sentencing Tr.
(Dkt. No. 175) at 21)

6. A two-level enhancement applies because the defendant obstructed justice with respect to the investigation and prosecution of the charged offenses, and the obstructive conduct related to (a) the offenses charged in the indictment, and (b) a closely related offense;

7. A three-level enhancement applies because Borker committed part of the offenses charged while on pretrial release in the case before Judge Sullivan;

8. Borker would be entitled to a three-level reduction if he clearly demonstrated acceptance of responsibility prior to sentencing.

(Id. at 1-2)

As to Criminal History Category, the Government asserted that Borker has five criminal history points, which correlates with Criminal History Category III. The Government assessed three points based on Borker's conviction in 10 Cr. 1266, and two additional points because Borker committed the instant offenses while on supervised release. (Id. at 2-3)

On March 20, 2018, Borker pled guilty to all three counts in the Indictment. (See Mar. 20, 2018 Plea Tr. (Dkt. No. 73)) During the Rule 11 proceeding, Borker allocuted as follows:

[I]n 2016, I was involved in the operation of opticsfast.com with my friend Michael Voller. At that time, OpticsFast contracted with a company called EasyPost. EasyPost provided an easy way to print shipping labels for the shipment of merchandise within the United States Postal Service. OpticsFast would generate a shipping label and EasyPost would bill OpticsFast for the cost of that label.

In order to have OpticsFast customers send in their eyewear to OpticsFast to repair, the shipping label would be sent by OpticsFast to its customers. If the customer was sent the shipping label but did not use it, OpticsFast's agreement with EasyPost required EasyPost to give OpticsFast a full credit for the cost of the unused shipping label, in most situations. In other words, OpticsFast would bear no cost for the labels that were not being used by its customers.
There were customers, however, who placed repair orders, and OpticsFast then sent them an EasyPost shipping label. OpticsFast was charged approximately $2.77 and up by EasyPost for each label. Certain of these customers decided at some point in the future to cancel their orders and not to use the shipping label. Michael Voller and I agreed to tell some of these customers that they had to pay OpticsFast $5.49 for the shipping label they received but did not use. This was my idea. . . . Based on this agreement, we both told this to customers, or caused them to be told this information. We told the customers they had to do this because OpticsFast had

incurred this expense for the shipping label and would lost this money if the customer did not reimburse OpticsFast.

These were false statements. This was not true that OpticsFast would lose this money if the customer did not reimburse OpticsFast. We concealed from the customer that OpticsFast would be reimbursed by EasyPost for this expense, and that OpticsFast would not lose money if the customer did not reimburse OpticsFast. We concealed from the customer that OpticsFast would be reimbursed by EasyPost for this expense, and that OpticsFast would not lose money on these labels if they were not used.

There were instances in which OpticsFast received the [$]5.49 from customers, based upon our false statements, and at the same time received a credit from EasyPost. OpticsFast received this money by mail, by credit card payments and by PayPal transfers. Although we told the customer the cost to OpticsFast was [$]5.49 per label, this was not true.

(Id. at 18-19) In short, during his allocution, Borker admitted to engaging in only a narrow subset of the fraudulent conduct that had been alleged in the Complaint and Indictment.

After Borker's allocution, the Court asked the Government whether it "request[s] that [the Court] ask any additional questions of Mr. Borker." (Id. at 21) The Government responded that "were this to proceed to trial, [its proof] would include other categories of misrepresentations and fraud connected to [Opticsfast]." The Government stated, however, that Borker's "allocution . . . adequately covers the elements of the crime sufficient for a guilty plea." (Id.) After defense counsel observed that "[t]here are major factual disputes . . . concerning the nature of [Borker's] criminal conduct," the Court stated that it would conduct a Fatico hearing in the event the parties could not resolve their factual disputes concerning the scope of Borker's criminal activity. (Id. at 21-22) The Court scheduled sentencing for May 23, 2018. (Order (Dkt. No. 70)) Because the parties could not resolve their factual disputes, the Court conducted a Fatico hearing on May 23, 2018, rather than the sentencing that had been envisioned.

### III.   PRE-HEARING SENTENCING SUBMISSIONS

Prior to the Fatico hearing, the Government and the Defendant made submissions concerning the applicable Sentencing Guidelines calculations, and the Probation Office submitted its Pre-Sentence Report ("PSR").

### A.   Government Submission

The Government alleged that Borker had participated in two fraudulent schemes. The first was a scheme to "defraud[] customers through the [Opticsfast] website's eyewear repair business," and the second was a scheme to "defraud[] customers through an unsolicited shipping label scheme, as described in defendant's plea allocution." (May 16, 2018 Govt. Br. (Dkt. No. 80) at 2, 3)  The Government's Guidelines calculations largely mirrored those set forth in the March 14, 2018 Pimentel letter, except that the Government no longer sought a three-level enhancement for Borker's alleged role as a manager or supervisor of criminal activity involving five or more participants.  Instead, the Government sought a two-level role-in-the-offense adjustment "because the defendant was an organizer, leader, manager, or supervisor" of criminal activity.  (Id. at 5)  The Government calculated Defendant's offense level at 19 and his Criminal History Category as III, which correlates with a sentencing range of 37 to 46 months' imprisonment.  (Id.)[5]

### B.   Defense Submission

Borker argued that his total offense level is 6 and that the applicable Guidelines range is 2 to 8 months' imprisonment.  (May 7, 2018 Def. Br. (Dkt. No. 77) at 9)  Borker agreed

---

[5]  The Government also suggested that Borker might not be entitled to a reduction for acceptance of responsibility, because he had, inter alia, "obstructed or impeded justice," "crafted a carefully worded plea allocution . . . [that] muted the gravity of his complicity in . . . fraud offenses," and "repeatedly sought to minimize or conceal the extent of his guilt by grossly misstating the facts." (May 16, 2018 Govt. Br. (Dkt. No. 80) at 4 n.3 (internal quotation marks and citations omitted))

that the base level offense is 7, and that a two-level enhancement is appropriate because his offense involves more than ten victims.  Borker also assumed that he would receive a three-level reduction for acceptance of responsibility.  (Id.)  Finally, Borker contended that no enhancement is appropriate for loss amount, role in the offense, obstruction, or committing an offense while on pretrial release.  (Id. at 8-9)

As to loss amount, Borker argued that no enhancement was warranted because "[t]he real loss in this case is no more than $763."  (Id. at 8)  According to Borker, the only fraud he perpetrated was the shipping label scheme he described during his plea allocution, which caused a loss of $5.49 to each of approximately 139 victims.  (Id. at 7-8)  Borker noted that the Government no longer contended that he had sold customers counterfeit eyewear or charged impermissible restocking fees, and argued that the Government could not prove any fraudulent repair scheme: "The Government's position is that because a relatively few customers complained about the service they received from [Opticsfast] in respect to their repair orders, they were victims of fraud. . . . Many people complain about online sales, but complaining, even if justified, does not necessarily suggest fraudulent intent."  (Id. at 2)

Borker also disputed the role in the offense adjustment and the obstruction enhancement, arguing that he had not managed or supervised the criminal activity of five or more people and had not obstructed justice.  (Id. at 8)

Finally, Borker disputed the three-level enhancement for committing an offense while on pretrial release, contending that "[t]he hearing will show that . . . Defendant began his criminal conduct in this case no earlier than January 2016," and that in any event, imposition of this enhancement would "doubly punish" him, since his criminal history score was increased

under U.S.S.G. § 4A1.1(d), "as he committed the instant offense while under the earlier sentence imposed by Judge Sullivan." (Id. at 9)

### C.     Presentence Report

The Probation Office's PSR calculates Borker's total offense level as 17 and his Criminal History Category as III, resulting in a Guidelines range of 30 to 37 months' imprisonment.  The PSR tracks the Government's Guidelines analysis except that it (1) applies a three-level role-in-the-offense adjustment; and (2) does not apply an enhancement for commission of the offense while on pretrial release.  (PSR (Dkt. No. 78) at 12-13)

## IV.   *FATICO* HEARING

On May 23 and 31, 2018, the court conducted a Fatico hearing concerning the parties' factual disputes.

### A.     The Government's Evidence

The Government called Michael Voller – Borker's co-defendant and a cooperating witness – Renata McGriff, a customer whom Borker allegedly defrauded; and United States Postal Inspector Ashley Borofsky, who testified as to the losses caused by Borker.  The Government also offered sixteen declarations from alleged victims of Borker's criminal activity.

#### 1.     Creation of Opticsfast

Both Voller and Inspector Borofsky testified about the origins of Opticsfast.  Prior to forming Opticsfast, Borker – from at least 2007 to December 2010 – had operated the online eyewear retailer DecorMyEyes, which sold eyeglasses and sunglasses, and offered repair services.  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 14 (Voller); GX 4 (Plea Tr.))  In connection with DecorMyEyes, Borker committed fraud by, inter alia, making false statements

10

to customers in connection with DecorMyEyes's repair services, and mispresenting the merchandise DecorMyEyes had in stock.  (GX 4)  Borker also threatened customers who complained.

In November 2010, the New York Times published an article about Borker and his operation of DecorMyEyes[6] (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 223 (Borker)), and at about the same time, Borker became aware that the New York Attorney General's Office was investigating consumer complaints regarding DecorMyEyes.  (Id.)

On November 23, 2010, Borker – from the email address "DecorMyEyes Sales Team"[7] – sent an e-mail to his staff at DecorMyEyes with the subject "Dont Worry."  (Id. at 224 (Borker); GX 112)  Borker writes:  "Décor needs a serious cleanup too much shit now has caught up with me.  It was bound to happen.  Luck[i]ly for me I have a friend who has a merchant processor account."  (GX 112)  Borker continued:  "All will be fine . . . it always is with me. Worst case I take a little break[,] rebuild a site with [a] new name under someone else[']s name and back in business[.]  I cant be stopped."  (Id.)

Opticsfast was incorporated on December 3, 2010.  On December 6, 2010, Borker was arrested in connection with his operation of the DecorMyEyes website.  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 141-42 (Borofsky); GX 7 (Incorporation Records))  Borker was detained until April 2011, when he was released on a bail package.  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 142 (Borofsky))  Judge Sullivan remanded Borker after a Fatico hearing in July 2012.[8]  While Borker was on pretrial release, Opticsfast's website, OpticsFast.com, was

---

[6] The article is available at https://www.nytimes.com/2010/11/28/business/28borker.html.
[7] Borker testified that in 2010 he used the e-mail address sales@decormyeyes.com for "everything."  (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 267 (Borker))
[8] Borofsky testified that Borker was remanded on the date of his sentencing in September 2012. (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 142 (Borofsky))  But the docket in 10 Cr. 1266

registered. (Id. at 20-21 (Voller))  Both the Opticsfast incorporation documents and the website

registration were in the name of Eugene Radomiskiy.[9]  (May 23, 2018 Hearing Tr. (Dkt. No. 95)

at 20-21 (Voller); GX 7)  According to Voller, Radomiskiy was Borker's friend and Voller's

acquaintance; he did no work for Opticsfast, but instead was "just a name." (May 23, 2018

Hearing Tr. (Dkt. No. 95) at 21 (Voller))  Voller further testified that Opticsfast was registered in

Radomiskiy's name because Borker "needed a front for someone to open up the corporation so

he could operate online business on the back end." (Id. at 20)

### 2.    **Operation of Opticsfast**

Voller testified that he and Borker have been "friends since high school."  In mid

to late 2012 – while Borker was on pretrial release in the case before Judge Sullivan – Borker

"asked [Voller] . . . to assist [Borker] in running the website" if Borker "had to go serve some

time."  Borker explained that he "needed a person that he trust[ed] to run the website while he[]

[was] gone."[10]  (Id. at 13-15, 21)

Many of the resources of DecorMyEyes – including its employees and databases

containing customer information and code – were "transferred over" to Opticsfast.  (Id. at 21-22)

Borker also drafted and posted the promotional material that appeared on the Opticsfast website.

(Id. at 56)  While he was out on bail, Borker handled the day-to-day operation of Opticsfast.  (Id.

at 21)  During this time, Voller was responsible for "[c]ustomer service, phone calls, e-mails,

---

reflects that Borker was remanded on July 11, 2012, following a hearing concerning a disputed
sentencing issue. (See 10 Cr. 1266, unnumbered minute entry)
[9]  The spelling of the name on the incorporation documents is "Yevgeny Radomyslsky." In
January 2014, the registration for OpticsFast.com was changed to Voller's name. According to
Voller, Radomiskiy contacted Voller and said that "he want[ed] out of the company. If you want
to maintain it, change it to your name." (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 24 (Voller))
[10]  While Borker was operating DecorMyEyes, he had "put together . . . a sister website for
[Voller] to operate" called "Eyewear Town." (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 15-16
(Voller))  Eyewear Town sold glasses, but did not offer repair services. (Id. at 16-17)

[and] working with suppliers." (Id.)  Voller described Borker as "a guru of advertising" who "knew how to create a certain campaign to get the customers to come on to the website[, and] . . . knew how to create different functionalities to the website where it would be easier for the customer to come on the website and put in orders." (Id. at 23)

When Judge Sullivan remanded Borker prior to his sentencing, "[the Opticsfast] website was left to [Voller]," who took over handling Opticsfast's day-to-day business.  (Id. at 22-23)  Under Voller's watch, the website "lost it[s] luster," and customer orders and traffic decreased.  (Id.)

While Borker was detained, Voller communicated with him via "[f]requent visits, [and] letters." (Id. at 25)  The two discussed Opticsfast's business, including the company's poor performance.  Borker told Voller, "don't worry about it, when [Borker] comes out he'll make it back to the way it was," and "turn the website around." (Id. at 26-27)  Voller also sought Borker's approval for certain decisions relating to the company.  For example, Voller consulted Borker when Radomiskiy said that he wanted his name taken off the registration of the Opticsfast website.  Borker "gave [Voller] a green light." (Id. at 25)

Borker finished his prison sentence in the DécorMyEyes case in March 2015, and began his term of supervised release at that time.  (Id. at 142 (Borofsky); id. at 27 (Voller))  According to Voller, once Borker was released, "[Borker] and [Voller] started working on getting the website back to the way it was."  Borker "redid all the [advertising] campaigns, . . . [and] created new functionalities [for] the website." (Id. at 27-28)  After his release, Borker received sixty percent of the company's profits, and Voller considered Borker his "partner" in the Opticsfast business.  Borker "d[id] all the back end stuff," including maintaining the website, while Voller "was more in charge of email, phone calls." (Id. at 28-29)  Borker also handled

customer service "when he was around and . . . had time and he wasn't working on the back end stuff." (Id. at 28)  Borker and Voller both made hiring decisions, and Borker trained new employees.  (Id. at 29-30)  Borker testified that he was (1) "the primary person who carried most of the load in setting up the business"; (2) the only person capable of "ma[king] sure the website was updated and maintained and working"; and (3) the self-declared "mastermind" of the business.  (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 227, 229-30)

### 3. Opticsfast's Eyeware Repair Business

#### a. Website Representations Concerning OpticsFast.com's Repair Services

The OpticsFast.com website describes the repair process as follows:

> You will send us your damaged eyewear for a repair price quote.  If the price that we quote you is acceptable, we will send you an invoice, once paid we will do the work and send your frame back.  If you deny the quote, we will return your item back to you in the same condition that you sent it to us in.  To start the process, you will be required to fill out an online web payment form that will require you to pay for only the costs of shipping.  The shipping price you will pay at this time, will be used to return the glasses back to you. . . .

(GX 1A)

Beginning in 2011 and continuing through Borker's indictment in this case, the OpticsFast.com website contained a section entitled "Frequently Asked Questions About Eyewear Repairs."  This section includes the following representations:

- "[OpticsFast] specialists are trained to repair all types of eyewear";
- OpticsFast will "provide a 60 day warranty on the repaired portion of [customers'] eyewear";
- Customers should allow two to three business days after eyewear in need of repair arrives at OpticsFast's facilities for OpticsFast to provide a quote, and customers should "[a]llow 2-3 working days at our facility to complete the repair"; and
- OpticsFast employs a "microwelding" technique to repair frames.

(See GX 1A; 1C, 1D)

The website also made frequent references to OpticsFast's alleged repair facility. For example, the website asserted that "[t]here is a reason why dozens of other repair shops use our facility to repair their own clients eyewear."  (GX 1A)

In 2015 – after Borker was released from prison – the website touted the company's "expert eyewear repair services," stating that its "trained lab technicians have decades of experience in the repair of eyeglasses and sunglasses," and that "[o]ur onsite lab is capable of doing" a variety of repairs and replacements.  (GX 1B)  The 2016 "About Us" page of the website states that after Opticsfast began operations as an eyewear retailer in 2007, "we decided to explore the idea of repair rather than replacement," and in late 2007 "remodeled the second floor of our office and hired the staff that today runs our laboratory.  Our two lab technicians have combined over 17 years of expert experience."  (GX 1C)  The website describes Opticsfast's in-house resources as follows:

> Our second floor has been separated to house two main labs that provide different services.
>
> - The Eyewear Repair Lab is staffed by two technicians, five days a week providing internet eyewear repair customers resolutions to the toughest repair jobs.
> - Our Prescription Lab is staffed by an optomotrists whose task is to produce roughly thirty prescription orders a day for both retail and internet customers.  Our lab does the cutting of lenses, shaping . . . frames, performing drill mounts, edging and surfacing as well as coatings[.]
>
> . . . We are able to offer extremely competitive prices, because all of our repairs are carried out in our own optical lab.  We do not outsource the work to third parties. We do not send the glasses somewhere else risking the possible loss of your merchandise. . . . Our competitors do not have two onsite lab's, thus they are not able to offer the same low prices as we do, day after day.  In fact the other repair websites you may have visited, probably use our facility to fix their customers frames.

(Id.)

By at least 2016, Opticsfast's website advertised free shipping for repair services: "We offer FREE pre-paid labels to our customers who wish to send in their eye wear for repair. Simply create a repair order and we will pay to get the item to our facility." (GX 1C)  The FAQ section also discussed the shipping label: "Once you complete the checkout form, you will receive an order number and an email with a FREE pre-paid shipping label. We recommend you use our shipping label which utilizes a signature confirmation so your item can be tracked online." (GX 1D)  The website further advised: "Since we are investing into this shipping label, if you decide to cancel your order, you may be asked to make the payment for the label if it is deemed necessary." (Id.)

The 2016 website cautions customers to "[p]lease keep in mind there are no refunds for repair related work." (GX 1C)

### b.   Voller's Testimony

Voller testified that many of the representations on the Opticsfast website about the company's repair services were false. For example, Opticsfast employed no optometrists and had no onsite labs or lab technicians. Indeed, Voller and Borker could do little more than "[t]ighten a screw" or "pop in a pair of lenses." Contrary to the representations on the company's website, Opticsfast outsourced repairs to "offsite labs." (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 39-40, 61-62 (Voller))

Voller testified that customers typically learned about Opticsfast from the company's website. Customers "would send . . . an email [describing their frames and what they needed repaired, and asking] how much it would cost, can you fix something like that?" (Id. at 37)  Opticsfast would provide "a generic response," and – if the customer inquired about price – Voller or Borker would provide an estimate for the repair job. The customer would then

mail the eyewear to be repaired. (Id. at 37-38, 44)  Once received, Opticsfast would assign an order number to the item, look for information in the delivery "advising . . . what needs to be done," and generate an invoice. (Id. at 38-39)

Voller, Borker, and an employee named Lena were involved in generating the invoices. (Id. at 40)  Borker testified that Opticsfast would generally determine what services to include in the invoices "[b]ased on the customer notes."  At times, however, the company would "include different suggested repairs that were not part of the . . . customer notes in the orders." (Id.)  Voller referred to these additional repairs as "extra upcharge[s]," and stated that "sometimes [these additional repairs] w[ere] necessary, sometimes [they] w[ere]n't."  According to Voller, "on a daily basis" Opticsfast employees suggested unnecessary repairs. (Id. at 41, 48)  The offsite labs Opticsfast used to make repairs were not involved in examining glasses when they first were delivered to Opticsfast. (Id. at 39-40)

OpticsFast had preset prices for specific services, and these prices were used when generating invoices.  The invoice amounts were, however, often higher than the estimates quoted to customers before they mailed their eyewear to Opticsfast for repair. (Id. at 41)  Voller explained that

> the general idea[] w[as] to tell the customer – well, to lowball the numbers initially, to have the customer send in the frames where they would [be] like, oh, my God this is great.  This is cheap, cheap service.  Let's just hypothetically say we would tell them it's $10 to repair something.  Once they send it in, then we can always inflate to 20, 25, 30, whatever it is.  But now we have the frames in our possession. . . . Once we had possession of a particular customer's frames, then it's a lot easier . . . to complete the repair at the price because we already had [the frames], and sometimes they're willing to pay the dollar amount that you're giving them just because you already have the frame and you're going to repair it.

(Id. at 41-42, 44-45)

Voller testified that he and Borker were responsible for establishing the practice of "lowballing" estimates. (Id. at 44)  Where customers sought estimates, Opticsfast provided unrealistically low quotes a "fairly high" percentage of the time – possibly as much as "75 percent, 80 percent." (Id. at 45)  Once a customer received an invoice – which could include both higher prices than those reflected in the estimate, and additional, unnecessary repairs – the customers could decide not to go through with OpticsFast's repair services and ask for OpticsFast to return their frames. (Id. at 46)

### c.   Customer Complaints

The Government introduced consumer complaints filed with the Better Business Bureau, and sixteen declarations from consumers complaining about their interactions with Opticsfast.

A consistent theme in these complaints is Opticsfast's poor customer service, as reflected in the time Opticsfast took to process repairs, and in the lack of professionalism Opticsfast employees demonstrated in their communications with customers.  Indeed, customers describe interactions with Opticsfast employees that appear irrational if not imbalanced.  Many of the more bizarre interactions are with "Becky S"; Borker testified (see May 23, 2018 Hearing Tr. (Dkt. No. 95) at 204) that "Becky S" is an alias that he used in Opticsfast correspondence. (See, e.g., GX 201A (Fernandez BBB Cmplt.) (complainant recounting that "Becky" responded to complainant's mention of the company's "F" rating with the Better Business Bureau by writing "F IS FOR FANTASTIC"); GX 300E ("Becky S" asserting, in e-mail to a customer who requested that Opticsfast return his glasses rather than replace the lenses, that "[t]here will be a $25 fee for the time you wasted of mine for the last 3 days"); GX 201A (Stefanski Cmplt.) ("Becky S" telling customer – who repeatedly asked Opticsfast to return his glasses after

deciding not to use the company for repairs – "I am very sorry for the problem we caused[;] [the glasses] went to the lab and they fixed it.  I can send you a picture.  Should I have them re-break them in the same place and send them back?"))

Indeed, many of the customers who filed complaints appear to have done so more because of the disturbing nature of their interactions with the company rather than because of any loss they suffered from doing business with Opticsfast.  (See, e.g., GX 300I ("When you correspond with this company they are the most unprofessional individuals I have ever encountered. . . . Even more important than a refund is putting this operation out of business."); GX 300N (consumer explaining that her complaint "is not so much about the money but the fact that I received something I can't use and that I didn't order and they wouldn't make it right"; seeking a "[r]efund and apology for only halfway filling an order . . . and an apology from the unprofessional customer service agent (Becky S.)")

Some complaints are grounded in misrepresentations Opticsfast made on its website.  (See GX 300F ("This company claims to be able to repair pretty much any damaged sunglasses. . . . [After receiving a quote for the requested repairs and paying that amount,] they said that they couldn't repair either of the sunglasses that I sent to them."); GX 300L ("I would like my property back per their FAQ section on their website."); GX 300E ("It is my understanding that you will provide an estimate within 3 to 5 business days upon receipt of the eye glasses.  It is now 8 business days since you received the eyewear and I still have not received the estimate.  This is not an accurate description of your advertisement and is eroding my confidence in doing business with you.")  Other customers focus primarily on conduct that Borker has admitted:  Opticsfast's efforts to bully those who ultimately decided not to use Opticsfast's repair services to pay the cost of the shipping label.  (See, e.g., GX 300K

(complaining that Opticsfast "threaten[ed] to turn [her] over to a collections agency if [she] didn't pay the $5.40 for the shipping label" that she had received))

Many customer complaints attest to Opticsfast's practice of "lowballing." Customer Jonathan Sceggel, for example, was quoted a price of $35.00 after providing Opticsfast with "a very clear JPEG file showing the exact area [of his glasses] that needed to be repaired." (GX 300J)  Sceggel then sent his glasses to Opticsfast for repair.  After "receiving the eyeglasses[,] [Opticsfast] would not stand by [its] estimate, but increased it to $70." (Id.) Customer Julie Lee made a similar complaint: "I was quoted a price to fix a pair of sunglasses. Now the seller is claiming I owe $59.00[]more dollars plus $12 more dollars in shipping.  This is nearly the price for new frames.  I would never have agreed to this price and they are holding my frames until I pay. . . . I'm scared to give them my credit card information because I'm scar[]ed they are scamming me.  They email me twice a day asking for repair money." (GX 300R)

Many of the customer declarations submitted by the Government assert that after customers paid for repairs, Opticsfast never made the requested repair, sent back different eyewear, or sent back eyewear that was damaged.  (See, e.g., GX 114 (replacement lenses never provided and no refund issued); GX 115 (original scratched pair of lenses returned to customer "along with a yellow sticky note saying that the lenses could not be fixed"); GX 120 (customer seeking repair of eyeglass frame sent back glasses with both lenses scratched in a manner that appeared intentional to the customer); GX 116 (customer received sunglasses with lenses that were "a completely different color from [the] original pair" sent to Opticsfast))

It is not clear whether the customer complaints introduced by the Government were ever resolved, either by a refund or otherwise.  As discussed below, Borker contends that

many repair service customers received refunds and that many Better Business Bureau customer complaints were successfully resolved.

### 4. **Evidence of Loss Amount**

Postal Inspector Borofsky testified about the loss caused by Borker's fraudulent conduct. Inspector Borofsky reviewed consumer complaints about Opticsfast submitted to the Better Business Bureau, the U.S. Postal Inspection Service fraud complaint system, and the FBI's internet crime complaint center. (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 143) Borofsky prepared a spreadsheet summarizing consumer complaints related to Opticsfast's repair business and shipping practices. (See id. at 144; GX 201) The spreadsheet reflects 262 consumer complaints, and calculates the loss amount based on the amount each consumer claims to have paid Opticsfast.[11] (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 147) Borofsky estimates that the complaints included in her spreadsheet reflect a total loss of $41,802.49. (GX 201) As to Borker's fraudulent shipping label scheme, Borofsky tallied a lost amount of $404.61. (Id.) Borofsky conceded that her calculations do not account for customer complaints that were subsequently resolved through refunds or otherwise. (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 159-61) Borofsky also testified that she spoke with only "a few people" listed on her spreadsheet. (Id. at 156).

At the conclusion of the Fatico hearing, the Government asserted that Inspector Borofsky's spreadsheet presents "the correct calculation of the loss amount." (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 299) This Court observed that the Government would "have to

---

[11] "Approximately 37" consumer complaints did not refer to an amount paid to Opticsfast. As to these customers, Borofsky assigned a loss amount equal to the average amount paid by consumers whose complaints referred to amounts paid to Opticsfast. (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 148-49)

[address loss amount at greater length] because there are a number of points in [Borofsky's]
testimony where . . . she conceded that [a] . . . refund had been made or made other concessions
that put into question the amount. . . . That [$40,000] number's going to have to be justified."
(Id. at 300)  The Government has not submitted additional data concerning loss amount.

### 5.     Evidence of Obstruction

In its pre-hearing brief, the Government contended that Borker obstructed justice
by lying to prosecutors during his "post-arrest, Mirandized interview, and [by making] false
certifications to the United States Probation Department regarding his place of employment."
(May 16, 2018 Govt. Br. (Dkt. No. 80) at 8)

In Borker's post-arrest interview, he told prosecutors that he had no ownership
interest in Opticsfast and that Opticsfast.com is Voller's website.  Borker told prosecutors that he
had sold DecorMyEyes inventory to Opticsfast and had provided certain IT services to the
company, but otherwise had no connection or dealings with Opticsfast.  (GX 2)  Borker also told
prosecutors that when he was transferred from prison to a halfway house and needed
employment, Voller suggested that he provide IT services to Valentina Accessories, Voller's
father's dry cleaning business.  According to Borker, he worked for Valentina Accessories –
attempting to modernize the business – "for a long time."  (Id.)

As to Borker's false certifications to the Probation Office, the Government
introduced approximately 20 monthly reports Borker submitted to his probation officers while on
supervised release.  In these reports, Borker stated that – beginning in September 2015 – he was
employed at Valentina Accessories working 40 hours per week, and earning $1,733.33 per
month.  (See GX 12A-12U)  In each monthly report, Borker certified that "all answers are
complete and correct."  (Id.)

Voller testified that Borker "needed a job when he came out [of prison]," and that Voller "set up a quasi job . . . us[ing] [Voller's] dad as a front," so that Borker could "let probation know that he is working doing something for [Voller's] dad in the dry cleaning business." Borker did not actually work for Valentina Accessories; "in reality, [Voller and Borker] would be working on the e-commerce business of OpticsFast." (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 64-65 (Voller)) Moreover, when Borker "told [Voller] he needed something in writing to probation, to give probation because they asked him to specify what he does," Voller signed a document that Borker drafted, which set out "a list of duties and responsibilities contracted to E-Malish Corporation."[12] (Id. at 66-67; GX 159) This document did not disclose the work Borker performed for Opticsfast. (Id. at 67 (Voller))

B.    **The Defendant's Evidence**

Defendant Borker testified on his own behalf. Most of Borker's testimony concerns the creation of Opticsfast and the company's repair services.

1.    **Creation and Operation of Opticsfast**

Borker testified that the New York Times article exposing his criminal conduct in connection with DecorMyEyes – as well as the fact that the New York Attorney General and other "regulators were on [his] case" – led to the development of Opticsfast. (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 169; May 31, 2018 Hearing Tr. (Dkt. No. 91) at 223) Borker "started OpticsFast [at] the end of November 2010." (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 168) According to Borker, he created the new company because "as soon as [his conduct] came out in [t]he New York Times, and as soon as the [New York] Attorney General got involved and

---

[12] "E-Malish Corporation" was Borker's company. (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 67 (Voller); id. at 195 (Borker) Accordingly, this document represents that Borker is providing IT services to Valentina Accessories through E-Malish. (GX 159)

as soon as everything came to light, [he] . . . c[ould]n't be behaving this way to customers, [he] couldn't do this kind of stuff on the internet anymore, and [he] ha[d] to start from scratch again[, and] . . . open up a brand new website." (Id. at 169-70)  Borker further explained that as a result of the negative press coverage, DecorMyEyes was placed on the "terminated merchant file," which made it impossible for customers to pay through a credit card.  (Id. at 168)

On November 25, 2010, Borker authored an email with the subject "Update."[13] (See DX 28)  The email states:  "Meet the New Me & I have good news, Tony has been terminated from this company effective immediately."[14]  (Id.)  Borker explains that he is creating a new business:  "I am going to be building a new website . . . that I will build on a new business model . . . This new structure will be 'customer service is actually nice this time[.]'  No more bullshit I am sick of all the crap and I am sick of the headaches."[15]  (Id.)  Borker further states:

> If they want a refund I will give them a refund.
> If they want a return with no restocking fee I will do it.
> I am not going to lie to customers about availability when item is DC
> No more shipping them wrong color and damaged shit from ebay
> No more fucking them over when they ask for a refund.
> No more cursing and getting them all mad at me.

### EVERYTHING CHANGES as of MONDAY.

(Id.) (emphasis in original).

Borker testified that he approached Eugene Radomiskiy, who was unemployed at the time, to set up a new website.  Borker told Radomiskiy that he would give him a commission per order, and would "show [him] how the whole process works . . . exactly how an Internet e-commerce is built."  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 170)  Borker also told

---

[13]  The exhibit does not reveal the recipients of the email.
[14]  Borker testified that he used the alias "Tony Russo."  (See May 23, 2018 Hearing Tr. (Dkt. No. 95) at 170)
[15]  Borker stated the new website was www.eyewearhome.com.  (DX 28)

Radomiskiy that he wanted him involved in Opticsfast because Borker "c[ouldn't] open a company under [his own] name; let's do it under [Radomiskiy's name]." (Id. at 170-71)  Borker "built the website [for Opticsfast] during that same [period] of time, at the end of November." (Id. at 171)

According to Borker, Michael Voller and Radomiskiy incorporated the new company.[16]  (Id.)  The OpticsFast website was registered in about July 2011, while Borker was on pretrial release in the DecorMyEyes case.  (Id. at 171-72)  Between that time and Borker's remand, the website generated $3.2 million in income.  (Id. at 172)  Voller was not involved in OpticsFast at all during this period.  (Id.)

Borker further testified that on the morning he was remanded in the DecorMyEyes case, he had asked Voller to monitor emails for him while he was at the sentencing hearing.  Borker "never returned home," and Voller and Borker's wife then operated Opticsfast, along with Radomiskiy and the Opticsfast staff, while Borker was imprisoned.  (Id. at 173)  Once Borker was released from prison in 2015, he resumed his work with Opticsfast.  He continued his work with Opticsfast until he was remanded for violating the terms of his supervised release.  (Id. at 174)

### 2.   Opticsfast's Repair Services and Loss Amount

During his testimony at the Fatico hearing, Borker attempted to demonstrate that only a miniscule proportion of the company's repair business resulted in consumer complaints. According to Borker, from the outset of Opticsfast's business to Borker's arrest, 27,157 orders for repair services were placed with Opticsfast.  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 179;

---

[16]  Borker also testified that Radomiskiy "did a lot of work for OpticsFast . . . a tremendous amount of work and picked up a salary," and he introduced emails showing Radomiskiy's communications with Opticsfast.  (See May 23, 2018 Hearing Tr. (Dkt. No. 95) at 194-95)

DX 23)  Of this total, Borker's data shows that 13,622 orders were successfully shipped to customers.  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 180; DX 23)  In another 8,144 cases, customers who had generated online repair orders never mailed their glasses to OpticsFast.[17] (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 181; DX 23)  280 orders were abandoned – that is, the customer mailed glasses to Opticsfast but never asked for the glasses to be returned.  (Id.) Another 5,111 orders were classified as "non-repaired orders shipped to customers."  According to Borker, this figure reflects "customers who indicated that they needed to get their glasses back because they were not interested in having them fixed through [OpticsFast]."  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 180; DX 23)

Borker further testified that OpticsFast issued 4,465 refunds to customers, at a cost of $585,935.50.  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 185; DX 23)  Of the 4,465 refunds, approximately 450 related to repair orders; these refunds amounted to $16,000 in total. (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 210)  Borker asserted that of 185 Better Business Bureau complaints filed between Borker's 2015 release from prison and his 2017 arrest, "47 out of those . . . reported satisfactory resolutions."  (Id. at 212)

As to the sixteen customer declarations submitted by the Government, Borker provided additional emails between Opticsfast and these customers.  According to Borker, these emails reflect Opticsfast's willingness to address the customers' concerns.  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 191; 198-204)

---

[17]  Borker sent shipping labels to more than six thousand of these customers.  He testified that he sought payment for the shipping labels from "[v]ery few, a handful" of these customer, based on "the tone of the customer's email" and his "mood swings."  (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 182-83; DX 24)

Borker also testified about the alleged misrepresentations on Opticsfast's website concerning the company's repair services. As to Opticsfast's representation that it had in-house labs and employed expert technicians, Borker described the labs Opticsfast actually worked with as "subcontractor[s]" and "partners" who performed "great quality" work. (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 189; see also May 31, 2018 Hearing Tr. (Dkt. No. 91) at 238-39 (maintaining that it "was 100 percent true," in light of Opticsfast's relationship with outside laboratories, to represent that Opticsfast "had specialists who were trained to repair all types of eyewear")) According to Borker, use of the term "in house" was not misleading, because the outside laboratories "were coming . . . on a daily basis and picking up the frames, dropping them off. [Borker] had access to these people on a daily basis." (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 242-43) Borker also pointed out that the company's automated emails to customers who had sent in their glasses states that the customer's eyewear "will be going to the lab today" (see GX 136), and argued that Opticsfast made no effort to conceal that its labs were not physically located in Opticsfast's offices. (Id. at 213) Borker also testified that the alleged false representations were mere "fluff" and "puffery." (Id. at 249)

Finally, Borker denied that he had "lowballed" customers or that Opticsfast had charged customers for unnecessary repair work. (Id. at 213-16)

## V.   POST-HEARING SUBMISSIONS AND POST-HEARING CONDUCT

### A.   Sentencing Submissions

After the Fatico hearing, both sides filed briefs that are largely consistent with their pre-hearing submissions. (See June 15, 2018 Def. Br. (Dkt. No. 94); June 25, 2018 Govt. Br. (Dkt. No. 93)) The Government argues, however, that Borker is not entitled to any reduction for acceptance of responsibility, because he "has remained steadfast in his efforts to minimize his

27

criminal conduct, including by denying that his fraud extended to Opticsfast's eyewear repair business in his written submission to the Court and while testifying at the [Fatico] [h]earing." (See June 25, 2018 Govt. Br. (Dkt. No. 93) at 21)  The Government now contends that Borker's total offense level is 22, and that the applicable Guidelines range is 51 to 63 months' imprisonment.  (Id. at 3)

## B.    Post-Hearing Conduct

On July 12, 2018, Borker – without the aid of his lawyer – sent a letter to the Court asserting that Voller had lied at the hearing.  Borker stated that "Voller was scared that his sister and father would get in trouble because they [had] assisted [Borker] in lying to the probation department regarding [his] employment at Valentina Accessories."  (See July 12, 2018 Def. Ltr. (Dkt. No. 100)).  Borker further stated that he was "very sorry that [he] caused [Voller's] family to become involved in these lies, however this does not give him the right to be dishonest, inconsistent and commit perjury in order to get leniency from the court."  (Id.)

Borker subsequently terminated Voller and Voller's sister's employment at Opticsfast, and transferred control of the Opticsfast website to a third party.  (Sept. 7, 2018 Govt. Ltr. (Dkt. No. 101) at 2-3)  Borker's communications regarding Voller's firing make clear that he intends to continue working in the online eyewear retail industry when he is released from prison.  (Id., Ex. C ("I have fired [M]arina [Voller] and [M]ike [Voller] and had a long long long process of changing passwords and getting all my systems in place.  [The third party] filed for corp last week.  Waiting for that to happen.  Waiting for her to open bank account, a mailbox [. . . ] etc[.].  Once that is in place we will start with repair business which will generate income.")

On November 22, 2018 – Thanksgiving Day – Borker sent a message to Voller's sister.  The message – which is clearly intended for Voller – reads as follows:

> How's the yearly family shindig going? . . . Lying to the Court and Prosecutors while stealing from best friends isn't going to work. Next year will certainly NOT be better. It will be exponentially worse. Next year will be filled with strip searches, visitation, corlinks, lockdowns, marshal transports, handcuffs & leg irons and of course many tears. Count on it. I will continue to do everything in my power until Justice is served. Cheers!

(Dec. 10, 2018 Govt. Ltr., Ex. B (Dkt. No. 108); see also April 18, 2019 Borker Ltr. (Dkt. No. 120) at 2) (Borker admitting that he sent the Thanksgiving Day message to Voller's sister).

## DISCUSSION

### I.   LOSS AMOUNT

#### A.   Legal Standard

U.S.S.G. § 2B1.1(b)(1) prescribes enhancements for fraud offenses based on loss amount. Loss equal to or less than $6,500 results in no enhancement. Here the Government contends that Borker caused a loss of $41,802.49. Where the loss amount is between $40,000 and $95,000, a six-level enhancement is applied.[18] See U.S.S.G. § 2B1.1(b)(1).

For Sentencing Guidelines purposes, loss amount "is the greater of actual loss or intended loss." "[A]ctual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1, cmt. n. 3(A)) "[F]or purposes of calculating the offense level associated with theft and fraud offenses, '[t]he court need only make a reasonable estimate of the loss' resulting from the defendant's crime." United States v. Abiodun, 536 F.3d 162, 167 (2d Cir. 2008) (quoting U.S.S.G. § 2B1.1, cmt. n. 3(C)) (emphasis in Abiodun). "The estimate of the loss shall be based on available information," taking into

---

[18]  For a loss amount between $6,500 and $15,000, a two-level enhancement is applied; for a loss amount between $15,000 and $40,000, a four-level enhancement is imposed. See U.S.S.G. § 2B1.1(b)(1).

account, inter alia, "[t]he approximate number of victims multiplied by the average loss to each

victim," and "the scope and duration of the offense and revenues generated by similar

operations." U.S.S.G. § 2B1.1, cmt. n. 3(C))

> Generally, the total loss amount is reduced by

>> [t]he money returned . . . by the defendant or other persons acting jointly with the
>> defendant, to the victim before the offense was detected.  The time of detection of
>> the offense is the earlier of (I) the time the offense was discovered by the victim or
>> government agency; or (II) the time the defendant knew or reasonably should have
>> known that the offense was detected or about to be detected by a victim or
>> government agency.

Id., cmt. n. 3(E)(i)).

> The Second Circuit has instructed, however, that "'loss in fraud cases includes the

amount of property taken, even if all or part has been returned.'" United States v. Coriaty, 300

F.3d 244, 251 (2d Cir. 2002) (quoting United States v. Carrozzella, 105 F.3d 796, 805 (2d Cir.

1997)); see also United States v. Samet, 200 F. App'x 15, 22 (2d Cir. 2006) (rejecting

defendant's contention that "the amount of loss calculated for [a] mass mailing scheme should

have been reduced by amounts actually refunded," because "[t]he amount of fraud loss . . .

should not be reduced by any amounts returned to the victims").  The most common justification

for this principle is that "the return of money . . . is often necessary for [a fraudulent] scheme to

continue." Carrozzella, 105 F.3d at 805; see also United States v. Koh, 199 F.3d 632, 642 (2d

Cir. 1999) (rejecting defendant's argument that the loss amount attributable to his fraud scheme

should be reduced by "a series of offsets," because "[the offsets] all involved money that was

necessary for the scheme to continue" (internal quotation marks and citations omitted)).

### B. <u>Analysis</u>

> The evidence demonstrates that Borker and Opticsfast misrepresented the

company's repair capabilities; frequently failed to perform requested repairs; and communicated

with defrauded customers in reprehensible – and occasionally threatening – fashion. However, the Government has not proffered evidence that reliably demonstrates the losses suffered by consumers, whether intended or actual.

The Government relies almost exclusively for its loss calculation on the spreadsheet of consumer repair-related complaints created by Inspector Borofsky. (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 299) This calculation is premised on the amounts that customers reported – in their complaints – had been paid to Opticsfast. (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 160) The Government did not verify the accuracy of these figures, however, nor did it verify that those who filed complaints were actually Opticsfast customers. Indeed, Borofsky testified that she had spoken to only "a few people" on the 262-person list. (Id. at 156). Nor does Borofksy know whether any of the customer complaints were subsequently resolved by Opticsfast. (Id. at 160)

The Court made clear at the Fatico hearing that it did not regard unverified and uncorroborated customer complaints as sufficient to demonstrate loss, and told the Government that it would need to supplement the record in order to justify its loss calculation of $41,802.49. (See May 31, 2018 Hearing Tr. (Dkt. No. 91) at 300) The Government has not done so. Instead, the Government states that "[o]ther courts have relied on similar customer complaints to tally loss amounts for purposes of Guidelines calculations." (June 25, 2018 Govt. Br. (Dkt. No. 93) at 15) The Government relies on unpublished decisions from other circuits, however, and these decisions are not binding here. In any event, these cases do not stand for the proposition that loss amount can be predicated on unverified and uncorroborated consumer complaints.

As to United States v. Socolovitch, 340 F. App'x 291 (6th Cir. 2009), that case merely highlights the shortcomings of the Government's evidence. In Socolovitch, there were

twenty-seven victims of a mail fraud scheme. Unlike here, the Government "personally contacted twenty-one of the victims and verified their amount of loss." The Government was not able to make contact with five victims, and did not include in its loss calculations any loss associated with these five victims. Id. at 297. Given the prosecutor's efforts to verify loss in Socolovitch, that case does not support the Government's argument that loss amount can be determined solely on the basis of unverified customer complaints.

In United States v. Levy, 335 F. App'x 324 (4th Cir. 2009), the Government relied at sentencing on "a chart listing the names and purported loss amounts of customers who had complained about Levy's businesses on an internet website called the Internet Crime Complaint Center." Levy, 335 F. App'x at 326. That case involved more verification than took place here, however. The FBI agent "testified that he consulted the victims listed on the [Internet Crime Complaint Center] website and confirmed their status as customers by searching through the email addresses found on Levy's computer." (Id. at 329; see also id. at 327) The agent then "attempt[ed] to contact the victims to verify their complaints." (Id. at 327). The agent was "able to speak with fifteen of [the 82] victims" to confirm their loss. (Id.) The Fourth Circuit concluded that – under these circumstances – it was reasonable for the district court to rely on this evidence in making the loss amount determination. The court vacated the sentence on other grounds, however, and remanded for resentencing. (Id. at 329)

Levy does not support the Government's position here, because Inspector Borofsky did not undertake the verification efforts made by the agent in Levy. Those who submitted complaints to the Better Business Bureau, the Postal Inspection Service, or the FBI were not verified as Opticsfast customers. Moreover, Inspector Borofsky spoke with only "a few" of the alleged 262 victims listed on her spreadsheet. Given the failure to verify that those

listed on the spreadsheet were in fact Opticsfast customers who lost money, the spreadsheet is not sufficiently reliable to demonstrate loss for Sentencing Guidelines purposes.[19]

        In addition to the spreadsheet, the Government has offered sixteen declarations from customers attesting to misconduct committed by Opticsfast employees. Many of these declarations refer to monies paid to Opticsfast for repairs that were never performed. In several instances, however, the customer received a refund from Opticsfast or received a credit from his or her credit card company or bank. (See, e.g., GX 115 (customer "refunded in full" by bank); GX 119 (Opticsfast "finally refunded [customer's] money" after "argumentative conversation" with Opticsfast customer service representative); GX 121 (customer "recover[ed] the money" by filing fraud claim with bank); GX 155 (customer "able to have [her] bank recall [her] check and restore the money to [her] account")) In any event, the Government has not explained why it would be appropriate to extrapolate from the handful of declarants who state that they did not receive a refund to the 262 victims listed in the spreadsheet.

        Because the Government has not proffered evidence establishing a loss amount in excess of $6,500, the Court concludes that no sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(1) is warranted.

---

[19] The failure to verify the alleged losses suffered by the complainants must also be considered in light of evidence offered by Borker that many repair service customers received refunds, and that 47 out of 185 Better Business Bureau complaints filed between Borker's 2015 release from prison and his 2017 arrest "reported satisfactory resolutions." (May 31, 2018 Hearing Tr. (Dkt. No. 95) at 210, 212) While the Government makes the non-controversial point that "any repayments or refunds made to prevent discovery of fraud or to provide 'a veneer of legitimacy' should not be credited against the calculation of a loss amount" (see June 25, 2018 Govt. Br. (Dkt. No. 93) at 16), the Government has not offered evidence that Opticsfast provided refunds in order to perpetuate the fraudulent repair scheme. To the contrary, Opticsfast's conduct appears more calculated to goad customers into filing complaints with law enforcement. In any event, the significance of the evidence regarding refunds is that it casts further doubt on the reliability of the Government's loss calculations.

## II.     Aggravating Role Adjustment

### A.     Legal Standard

U.S.S.G. § 3B1.1 provides for an adjustment where the defendant is an "organizer, leader, manager, or supervisor" in criminal conduct. U.S.S.G. § 3B1.1. "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity," the Guidelines prescribe a two-level adjustment. Id. § 3B1.1(c). If the criminal activity involves five or more participants or is "otherwise extensive," a three-level adjustment is imposed where the defendant was a "manager or supervisor." A four-level adjustment applies where the defendant was an "organizer or leader" of such criminal activity. Id. § 3B1.1(a)-(b).

For Sentencing Guidelines purposes, a defendant is a "manager or supervisor" of criminal activity if he "exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants." United States v. Hertular, 562 F.3d 433, 448-49 (2d Cir. 2009) (quoting United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002)). For the adjustment to apply, "it is enough to manage or supervise a single other participant." United States v. Al-Sadawi, 432 F.3d 419, 427 (2d Cir. 2005). Moreover, "[t]he fact that other persons may play still larger roles in the criminal activity does not preclude a defendant from qualifying for a [Section] 3B1.1(b) enhancement." Hertular, 562 F.3d at 449 (citing United States v. Wisniewski, 121 F.3d 54, 58 (2d Cir. 1997)).

### B.     Analysis

The Government contends that a two-level adjustment is appropriate based on Borker's role as an "organizer, leader, manager, or supervisor" of the charged criminal conduct.

Borker contends that a role-in-the-offense adjustment is unwarranted because the offense – which he construes as involving only the shipping label scheme – "was a relatively

34

minor fraud." "Although it was the Defendant's idea to misrepresent the facts to the customers, he did [not] supervise anyone to help him." (June 25, 2018 Def. Br. (Dkt. No. 94) at 12)  While Voller agreed with Borker to carry out the shipping label fraud, Voller "was Defendant's partner and as such should not be found to have been someone supervised by Defendant." (Id.)

Borker's arguments are not persuasive.  As an initial matter, and as discussed above, Borker's fraudulent conduct extended beyond the shipping label scheme and included Opticsfast's repair services.  Opticsfast's repair services operation involved employees other than Borker and Voller.  (See, e.g., May 23, 2018 Hearing Tr. (Dkt. No. 95) at 29, 40 (Voller) (Borker and Voller "hired a girl named Lena to do repairs" and had her prepare invoices for repair requests))

In any event, Borker's argument that he did not supervise Voller is incorrect.  The Government has demonstrated that Borker "exercised some degree of control over" Voller such that Borker constitutes a "manager or supervisor" for purposes of the role-in-the-offense adjustment.  Indeed, Borker testified that he was the "mastermind" of the Opticsfast operation. (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 230)  And Voller's participation in Opticsfast began only when Borker was imprisoned; Borker asked Voller "to run the website while he [wa]s gone." (May 23, 2018 Hearing Tr. (Dkt. No. 95) at 21 (Voller))  As Borker testified, however, he remained "the ultimate decision-maker at the company." (May 31, 2018 Hearing Tr. (Dkt. No. 91) at 234)  Borker's control over Voller is also confirmed by his termination of Voller's employment at Opticsfast.  (See Sept. 7, 2018 Govt. Ltr. (Dkt. No. 101) at 2-3)  In sum, a two-level role-in-the-offense adjustment is proper applied pursuant to U.S.S.G. § 3B1.1.

### III.    Obstruction of Justice

#### A.    Legal Standard

U.S.S.G. § 3C1.1 provides for a two-level adjustment where

(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense. . . .

U.S.S.G. § 3C1.1. Where the alleged obstruction "occur[s] prior to the start of the investigation of the instant offense of conviction," the adjustment may apply "if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense." U.S.S.G. § 3C1.1, cmt. n. 1.

The Guidelines commentary to Section 3C1.1 provides an extensive, non-exhaustive list of conduct to which this adjustment applies, including "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so"; "producing or attempting to produce a false, altered, or counterfeit document or record during an investigation or judicial proceeding"; "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense"; and "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1, cmt. n. 4(A), (C), (G), (H). False information is "material" where, "if believed, [it] would tend to influence or affect the issue under determination." Id., cmt. 6.

The Guidelines commentary likewise provides a non-exhaustive list of conduct to which the obstruction of justice adjustment does not apply. As a general matter, "making false statements, not under oath, to law enforcement officers" does not warrant an obstruction

adjustment, unless the statements fall within the ambit of U.S.S.G. § 3C1.1, cmt. n. 4(G), just described.  Similarly, "providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation" does not warrant an obstruction adjustment.  U.S.S.G. § 3C1.1, cmt. 5(B), (C).

Finally, "[b]ecause th[e] term ["willfully"] implies a mens rea requirement," the Second Circuit "ha[s] generally limited the application of [this] Guideline to those cases in which the defendant had the specific intent to obstruct justice."  United States v. Khedr, 343 F.3d 96, 102 (2d Cir. 2003) (internal quotation marks and citations omitted); see also United States v. Young, 811 F.3d 592, 604 (2d Cir. 2016) (obstruction adjustment was "not supported by the necessary factual findings" where defendant made material false statements during interview with probation officer, but district court made no finding as to defendant's intent).

**B.  Analysis**

The Government maintains that Borker "obstructed justice in at least one of two ways:  by submitting false certifications and false documents to the United States Probation Department regarding his employment from the time of his release to just before his arrest; and by repeating [these] pre-arrest lies in his post-arrest, Mirandized interview to federal prosecutors and agents."  (June 15, 2018 Govt. Br. (Dkt. No. 93) at 19)  The Government further argues that Borker's Thanksgiving Day message to Voller's sister "may give rise to another two level sentencing enhancement" for obstruction.  (Dec. 10, 2018 Govt. Ltr. (Dkt. No. 108) at 2 n.2)

As to Borker's post-arrest interview, the Government has not demonstrated that his false statements "significantly obstructed or impeded the official investigation or prosecution of the instant offense."  As discussed above, the Guidelines provide that "making false statements, not under oath, to law enforcement officers" will not trigger an obstruction of justice

adjustment absent such a showing.  Accordingly, Borker's post-arrest statements do not provide a basis for applying an obstruction of justice adjustment.

As to Borker's false certifications concerning his employment, the Court concludes that the Government has not demonstrated that Borker's lies about his employment with Valentina Accessories were material, or that Borker had the specific intent to obstruct justice.  The Government's theory as to this adjustment is that Borker lied about working at Valentina Accessories because he was trying to cover up his work at Opticsfast.  (June 15, 2018 Govt. Br. (Dkt. No. 93) at 20)  However, the evidence includes probation officer notes showing that Borker disclosed – to some extent – his work for Opticsfast.  (See June 25, 2018 Def. Br., Ex. 5 (May 18, 2016 probation officer notes) (Dkt. No. 94-5) ("The subject reported that he continues to be employed at Valentina Accessories in Brooklyn.  The subject also reported that he has been assisting Mr. Michael Voller with the selling of his inventory of sunglasses on Mr. Voller's website, Optic Fast.  The subject claimed that, while he mostly performs data entry, he also reported to have some customer contact.  The subject insisted that he has been professional in his limited interactions with customers."); id. (Oct. 24, 2016 probation officer notes) ("The offender led officers upstairs to his office, where he had a large inventory of designer sunglasses. . . . This officer asked if he has any contact with customers, and he stated that his business partner deals exclusively with the customers, while he simply handles the 'back end' of the business. . . ."))  Acknowledging that Borker was not forthright about the extent of his involvement with Opticsfast, he said enough to put the Probation Office on notice that he was once again engaged in the online eyewear retail business.  Given these circumstances, this Court cannot find that his lies about working at Valentina Accessories were material.

As to Borker's Thanksgiving Day message to Voller's sister (Dec. 10, 2018 Govt. Ltr., Ex. B (Dkt. No. 108)), however, the analysis is different. As an initial matter, and as discussed above, although Borker sent the message to Voller's sister, it was clearly intended for Voller. Borker makes reference to Voller "[l]ying to the Court and Prosecutors." (Id.) This is a clear allusion to Voller's testimony at the Fatico hearing. The message is threatening on its face. Borker tells Voller that he will do "everything in [his] power" to make sure that Voller is sent to prison, where his days "will be filled with strip searches, . . . handcuffs & leg irons and of course many tears. Count on it." (Id.)

Given that Borker was well aware that Voller was a cooperating witness, the Court concludes that this message was sent with the specific intent to "threaten[], intimidate[e], or otherwise unlawfully influenc[e] a . . . witness, . . . or attempt[ ] to do so." Borker sent this threatening message to Voller knowing that he was a Government witness for purposes of Borker's sentencing, and knowing that Borker's sentencing proceedings had not yet concluded. Given these circumstances, a two-level adjustment for obstruction of justice will be imposed.

## IV.  Commission of Offense While on Release

### A.  Legal Standard

U.S.S.G. § 3C1.3 provides for a three-level adjustment "[i]f a statutory sentencing enhancement under 18 U.S.C. § 3147 applies. . . ." U.S.S.G. § 3C1.3. That statute, in turn, provides that "[a] person convicted of an offense committed while [on pretrial release] shall be sentenced, in addition to the sentence prescribed for the offense[,] to . . . a term of imprisonment of not more than ten years if the offense is a felony." 18 U.S.C. § 3147. In short, this Guideline provision "applies . . . when a defendant is sentenced for an offense committed while released in connection with another federal offense." U.S.S.G. § 3C1.3, cmt. n. 1.

39

**B.**     **Analysis**

Borker does not dispute that he operated Opticsfast while he was on pretrial release in the DecorMyEyes case. The Government contends that Borker was engaged in fraud at Opticsfast while he was on pretrial release, and that accordingly a sentencing adjustment pursuant to U.S.S.G. § 3C1.3 is warranted.

Borker argues – as a preliminary matter – that no enhancement can be imposed under Section 3C1.3 because – at the time he committed fraud at Opticsfast – he was on pretrial release in the DécorMyEyes case, and not in the instant case. (See June 25, 2018 Def. Br. (Dkt. No. 94) at 10 ("The Government takes the extraordinary position, which not even the PSR adopts, that a 3-point enhancement is warranted because Defendant committed part of the offen[s]e 'while on pretrial release' in another case.")) Nothing in the Guidelines, its commentary, or the underlying statute suggests that the defendant must be on pretrial release in the same case for the enhancement to apply, however. Indeed, the legislative history of the underlying statute, 18 U.S.C. § 3147, suggests the opposite:

> "Section 3147 is designed to deter those who would pose a risk to community safety by committing another offense when released under the provisions of this title and to punish those who indeed are convicted of another offense. This section enforces the self-evident requirement that any release ordered by the courts include a condition that the defendant not commit another crime while on release. Given the problem of crime committed by those on pretrial release this requirement needs enforcement."

United States v. Gowing, 683 F.3d 406, 408-09 (2d Cir. 2012), as amended (June 18, 2012) (quoting S.Rep. No. 98–225, at 34 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3217) To limit application of the enhancement to cases in which a defendant commits an offense while on pretrial release in the same case would undermine the statutory purpose. See United States v. Davis, 114 F.3d 400, 403 (2d Cir. 1997) ("The statute is concerned solely with whether a person

released on bail in connection with a federal criminal charge takes action in violation of federal law while on pretrial release.  By its terms, the statute regulates the conduct of individuals deemed fit for pretrial release during their time under judicial supervision.")  And courts have applied the enhancement in circumstances similar to those here.  See id. (applying enhancement where defendant committed narcotics offenses while on pretrial release in case involving tampering with motor vehicle identification numbers).  In sum, a Section 3C1.3 enhancement is permissible here even though Borker was on pretrial release in another case at the time he committed the instant offenses.

Borker next argues that a Section 3C1.3 enhancement is impermissible because it would constitute double-counting, in that Borker "is subject to a two-point increase in his Criminal History score under section 4A1.1(d) based upon the fact that he committed the instant offense while under the earlier sentence imposed by Judge Sullivan." (June 25, 2018 Def. Br. (Dkt. No. 94) at 10).  As the Second Circuit has explained, however, "the offense level and criminal history category 'measure different things. The offense level represents a judgment as to the wrongfulness of the particular act. The criminal history category principally estimates the likelihood of recidivism.'"  United States v. Pereira, 465 F.3d 515, 522 (2d Cir. 2006) (quoting United States v. Campbell, 967 F.2d 20, 24 (2d Cir. 1992))  Accordingly, a district court may "use[] a prior offense to calculate both the offense level and the criminal history category[.]" Id. (emphasis in original); see also United States v. Douglas, 589 F. App'x 323, 325 (6th Cir. 2015) ("Defendant's alternative claim that the district court engaged in impermissible double counting [by using the same facts to increase both his total offense level under § 3C1.3 and his criminal history score under § 4A1.1(d)] likewise fails.  Because a defendant's offense level and criminal

history category are intended to reflect different concerns, a district court may use the same facts to increase both the offense level and the criminal history score.").

Finally, Borker argues that the enhancement is inapplicable because "there is no proof that Defendant committed crimes while on bail in his earlier case." (June 25, 2018 Def. Br. (Dkt. No. 94) at 10)  As discussed above, however, Borker's criminal activity includes a fraudulent repair services scheme, which commenced when Opticsfast's website began operations in 2011.

While Borker's objections to the Section 3C1.3 enhancement are not persuasive, the Court finds that application of the enhancement here would present issues (1) under Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); and (2) as to adequate notice.  The Second Circuit has held that where 18 U.S.C. § 3147 is applicable, the rule set out in Apprendi – requiring that a fact increasing a defendant's penalty above the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt – "also applies[,] because section 3147 exposes [a defendant] to a higher maximum, i.e., ten more years, than the highest maximum he could have received [on the charged counts of conviction]."  United States v. Confredo, 528 F.3d 143, 155 (2d Cir. 2008); see also United States v. Gowing, 683 F.3d 406, 411 (2d Cir. 2012), as amended (June 18, 2012) (acknowledging "that § 3147 is subject to Apprendi because it 'exposes the defendant to the risk of a sentence that exceeds the statutory maximum'" (quoting Confredo, 528 F.3d at 155)).

The Second Circuit's stance on this issue differs from that taken by other circuits, several of which have rejected Apprendi challenges to Section 3C1.3 enhancements (and enhancements premised on a predecessor provision, U.S.S.G. § 2J1.7) – at least where the sentence imposed pursuant to the Guidelines enhancement does not exceed the statutory

maximum for the offense of conviction.  See, e.g., United States v. Samuel, 296 F.3d 1169, 1173-775 (D.C. Cir. 2002); United States v. Randall, 287 F.3d 27, 30-31 (1st Cir. 2002); United States v. Parolin, 239 F.3d 922, 930 (7th Cir. 2001).  Moreover, this Circuit maintains that "the Apprendi rule applies to the resolution of any fact that would substitute an increased sentencing range for the one otherwise applicable to the case," even where the resulting sentence does not exceed the otherwise applicable maximum sentence.  United States v. Gonzalez, 420 F.3d 111, 129 (2d Cir. 2005).

Here, Borker has not admitted that the offenses to which he pled guilty were committed while he was on pretrial release.  Indeed, in his plea allocution, Borker only admitted to conduct that took place years after he was on pretrial release.  Accordingly, application of a Section 3C1.3 enhancement here would appear to run afoul of Apprendi.

Separate and apart from the Apprendi issue, the Court is concerned about the adequacy of the notice Borker received that his sentence for the instant offenses would be subject to an enhancement pursuant to 18 U.S.C. § 3147.  The commentary to Section 3C1.3 provides that the "[a]n enhancement under 18 U.S.C. § 3147 applies, after appropriate sentencing notice, when a defendant is sentenced for an offense committed while released in connection with another federal offense."  U.S.S.G. § 3C1.3 (Background) (emphasis added).  The Second Circuit has not offered instruction as to what constitutes appropriate notice, but in this Circuit it is the practice for the Government to notify the defendant of the applicability of the enhancement by referencing 18 U.S.C. § 3147 in the indictment.  See, e.g., United States v. Douglas, 713 F.3d 695. 696-97 (2d Cir. 2013) ("Douglas pled guilty to a two-count superseding information . . . charg[ing] him with conspiracy to distribute methamphetamine and cocaine . . . and with misdemeanor possession of heroin, in violation of 21 U.S.C. § 844 and 18 U.S.C. § 3147, for the

incident that occurred while he was on pretrial release."); United States v. Royer, 549 F.3d 886, 890 (2d Cir. 2008) ("[Defendant] pleaded guilty to a separate indictment . . . charging him with making false statements . . . and with committing an offense while on pretrial release in violation of 18 U.S.C. § 3147); United States v. Tillman, No. 10 CR. 127-01 RWS, 2011 WL 2175803, at *1 (S.D.N.Y. June 2, 2011) (counts in indictment alleging misrepresentations in applications for food stamp benefits and compensation for work-related injuries specified violations of 18 U.S.C. § 3147); United States v. Pennick, No. 17-CR-15-A, 2018 WL 3120570, at *1 (W.D.N.Y. June 26, 2018) ("The Indictment also includes notice of a sentence enhancement for committing a crime while on pretrial release under 18 U.S.C. § 3147."); United States v. Rodriguez, No. 16-CR-236 (VAB), 2017 WL 1902149, at *1 (D. Conn. May 9, 2017) ("The indictment charges Mr. Rodriguez with two counts of possession with intent to distribute and distribution of heroin . . . and two counts of committing an offense while on release in violation of 18 U.S.C. § 3147); United States v. Brown, No. 2:13-CR-131, 2016 WL 6537998, at *1 (D. Vt. Oct. 14, 2016), report and recommendation adopted, No. 2:13 CR 131, 2016 WL 6537952 (D. Vt. Nov. 3, 2016) (Defendant "pleaded guilty to the three counts charged in a Superseding Information," including Count Three, "committing a felony offense while on pretrial release, in violation of 18 U.S.C. § 3147(1)"); United States v. Brown, No. 10-CR-230S, 2012 WL 4103857, at *1 (W.D.N.Y. Sept. 17, 2012) ("The superseding indictment in this case . . . included all of the previous counts but also added," inter alia, "one count giving defendant notice of a potential criminal offense that occurred while on bail, pursuant to 18 U.S.C. § 3147(1)"). Where the charging instrument does not allege a violation of 18 U.S.C. § 3147, the Government has sometimes filed a notice of its intention to seek such an enhancement. See, e.g., United States v. Davis, 114 F.3d 400, 401 (2d Cir. 1997)

Here, the record contains no mention of 18 U.S.C. § 3147. The Government did not charge Borker with a violation of 18 U.S.C. § 3147, nor did it file any notice of its intention to seek an enhancement pursuant to this statute. Section 3147 and its penalties were likewise not mentioned during Borker's Rule 11 allocution.

While some cases in this Circuit suggest that a defendant's execution of a pretrial release form advising him of penalties for committing offenses while on pretrial release could constitute sufficient notice, see United States v. Davis, 114 F.3d 400, 403 (2d Cir. 1997); Gibbs v. United States, No. 92 CIV. 847 (JFK), 1992 WL 147622, at *2 (S.D.N.Y. June 16, 1992) – the defendants in these cases not only executed such pretrial release forms, but also were either charged with violating § 3147, or received a formal notice of the Government's intention to seek an enhancement pursuant to this statute. Davis, 114 F.3d at 401; Gibbs, 1992 WL 147622, at *1. In any event – assuming Borker executed such a form when he was released in 10 Cr. 1266 – that "notice" would have come approximately seven years before his arrest in this instant case.

The Government's failure to provide sufficient notice of its intention to seek an enhancement pursuant to § 3147 provides an additional ground for this Court's conclusion that an enhancement pursuant to U.S.S.G. § 3C1.3 is not appropriate.

Accordingly, a three-level enhancement pursuant to U.S.S.G. § 3C1.3 will not be imposed.

## V. **Acceptance of Responsibility Reduction**

### A. **Legal Standard**

Section 3E.1.1 of the Sentencing Guidelines provides for a two-level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense . . . ." U.S.S.G. § 3E1.1(a).

Typically,

> [e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3, will constitute significant evidence of acceptance of responsibility.

Id., cmt. n. 3 (internal citation omitted).[20] "[T]his evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." Id. Moreover, "[a] defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." Id.

"Conduct resulting in an enhancement under [U.S.S.G.] § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both § 3C1.1 and § 3E1.1 may apply." Id., cmt. n. 4. The Second Circuit has affirmed on several occasions a district court's simultaneous application of Section 3C1.1 and Section 3E1.1, but done so with limited explanation.[21] See, e.g., United States v. Restrepo, 936 F.2d 661, 669 (2d Cir. 1991) (district court properly found defendant's acceptance of responsibility "exceptional" where defendant – who obstructed justice by refusing to supply a handwriting exemplar

---

[20] "[A] defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction" in order to receive the reduction. However, "[a] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1(a), cmt. n. 1.

[21] Courts in this district appear most willing to credit defendants for acceptance of responsibility despite obstructive conduct where the obstruction occurs long before the defendant's acceptance of responsibility. See, e.g., United States v. Teyer, 322 F. Supp. 2d 359, 368 (S.D.N.Y. 2004); United States v. Maurer, 76 F. Supp. 2d 353, 360 (S.D.N.Y. 1999), aff'd, 226 F.3d 150 (2d Cir. 2000).

in response to a court-ordered subpoena – "pled guilty to all charges in a four count

indictment, and admitted in some detail his activities in connection with the criminal

enterprise").

    **B.**    **Analysis**

        In asserting that Borker is not entitled to credit for acceptance of responsibility,

the Government focuses primarily on the limited nature of Borker's admissions during his Rule

11 allocution, and on his "frivolous contest[ing of] the factual basis for Guidelines

enhancements." (June 15, 2018 Govt. Br. (Dkt. No. 93) at 22)  The Court concludes, however,

that Borker's obstruction of justice precludes an acceptance of responsibility reduction.  Borker

has not pointed to any basis for concluding that his acceptance of responsibility is "exceptional"

or "extraordinary" so as to overcome the presumption that "[c]onduct resulting in an

enhancement under [U.S.S.G.] § 3C1.1 . . . ordinarily indicates that the defendant has not

accepted responsibility for his criminal conduct."  U.S.S.G. § 3C1.1, cmt. n. 4.  Accordingly,

Defendant's offense level will not be reduced for acceptance of responsibility.

## CONCLUSION

Defendant Borker's Sentencing Guidelines total offense level is 13; he has five criminal history points, placing him in Criminal History Category III, and the applicable Guidelines range is 18 to 24 months' imprisonment.[22]

Dated:  New York, New York
      April 24, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[22] The underlying Guidelines calculations are as follows:  (1) pursuant to U.S.S.G. § 3D1.2(d), Counts One, Two, and Three are grouped together because the offense level is determined largely on the basis of the total amount of loss; (2) pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7 because the statutory maximum term of imprisonment for the count of conviction is 20 years or more; (3) pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), a two-level enhancement applies because the offense involved ten or more victims; (4) pursuant to U.S.S.G. § 3B1.1(c), a two-level enhancement applies because the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in [subsections] (a) or (b); and (5) pursuant to U.S.S.G. § 3C1.1, a two-level enhancement applies because the defendant willfully obstructed, impeded, and attempted to obstruct and impede the administration of justice with respect to the investigation and prosecution of the charged offenses.